UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WERNER WOELLECKE and TERRY HAGGERTY
individually and on behalf of
similarly situated LL1 through LL5
former Ford Motor Company managers,

                                              **CLASS ACTION**

      Plaintiffs,                             Case No.

vs.                                        Hon.

FORD MOTOR COMPANY,
a Delaware Corporation,

      Defendant.

---

Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Pitt, McGehee, Palmer and Rivers PC
Attorneys for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
mpitt@pittlawpc.com
mbonanni@pittlawpc.com

Kevin M. Carlson (P67704)
Kevin M. Carlson PLLC
Attorney for Plaintiffs
P.O. Box 6028
Plymouth, MI 48170
(734)386-1919 (phone/fax)
kevin@kevincarlsonlaw.com

---

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND MONEY DAMAGES AND JURY DEMAND**

Plaintiffs, individually and on behalf of a class of other Ford Motor Company ("Ford" or "Company") similarly situated former LL1 through LL5 managers, bring these wrongful termination claims against the Company for the following reasons:

## Introduction

1.     Our national employment retirement law, the Employee Retirement Income Security Act, ("ERISA") protects employees who, through their employment, participate in retirement income and health and welfare benefit plans. Since employers control an employees' ability to earn retirement benefits through continued employment, Congress made it unlawful for an employer to make adverse employment decisions motivated by an intention to deprive employees of retirement benefits for which they would become eligible through continued employment.

2.     Congress embedded this policy into Section 510 of ERISA, which makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit plan]." 29 U.S.C. § 1140.

3.    In order to reduce operating expenses and reduce debt and pension liabilities, Ford adopted a Salaried Involuntary Reduction Process ("SIRP") which was carried out in Four Waves.

4.    Ford, at a cost of more than $28 million dollars, retained the services of Boston Consulting Group ("BCG") to develop a headcount and pension reduction plan.  This plan was promoted as a High-Tech program designed to modernize Ford and was given the title of "Smart Redesign." At the core of the BCG program was a proprietary algorithm that was capable of quickly reviewing information from tens of thousands of personnel records. This automated system was deliberately programmed to target older and higher pension-cost salaried employees based on legally protected characteristics including the employee's proximity to retirement benefit milestones or the employee's age.

5.    Plaintiffs and the other LL1 through LL5 managers ("Managers") were separated in one of the Four Waves ending on May 31, 2019.

6.    Plaintiffs are Managers who were selected for separation in the 2019 SIRP for the purpose of preventing them from reaching important pension milestones which would have allowed them to receive greater retirement benefits and consequently would have dramatically increased Ford's pension obligations to its former managers.

7.      Managers such as Plaintiffs, hired before January 1, 2004, were eligible to participate in Ford's General Retirement Plan ("GRP").  Milestones for full retirement benefits per the terms of the GRP included a supplemental benefit upon attaining 30 years of Ford Service, regardless of age ("Service Milestone" or "30 and out") or attaining the age of 55 and at least 10 years of Ford Service, thus entitling the employee to an early retirement benefit ("Age Milestone" or "55 and 10").

8.      Ford, with the aid of the BCG algorithm, terminated Plaintiffs for the purpose of preventing them from attaining their "30 and Out" supplemental benefit and "55 and 10" early retirement benefit, or both.

9.      By terminating its Managers to prevent them from attaining one or both Milestones, Ford significantly reduced the employee's lifetime retirement benefits and significantly improved its balance sheet by reducing its ongoing pension obligations.

10.     The impact on Ford's long-term Managers terminated short of their Age and Service Milestones has been financially devasting.  In one case presented in this Complaint, a terminated Manager's lump sum pension at 53 years of age and 27.5 years of service has been valued at $865,000. If the Company permitted him to work until September 1, 2020, at age 55, the lump sum value of his pension would be $1.633 million.  If the Company permitted him to work until November 1, 2021 and thereby attaining 30 years of service, the lump sum value of his pension would be $1.890 million.

11.     Many Managers who were notified of their impending terminations and who were close to reaching either a Service or Age Milestone requested that Ford "Bridge" them to one or both Milestones. Bridging could be accomplished in several ways.  One form of Bridging would be to delay the Manager's termination date until he or she reaches a pension Milestone. Another form of Bridging is for the Company to add to the employee's age or years of service so that the employee will achieve an important retirement milestone.

12.     The opportunity for a Manager covered by ERISA to be Bridged is a retirement benefit set forth in a Ford ERISA plan and is a protected ERISA right.

13.     Qualified Managers (LL1 through LL5) who were terminated in the 2019 SIRP were entitled to Bridging pursuant to Ford's Select Retirement Plan ("SRP"). Each of them could have received an appropriate Bridge to greater retirement benefits if Senior management had informed them of their right to apply for a Bridge or to meaningfully appeal any adverse decision on their application.

14.     Instead of being honest and forthright about this Bridging benefit, Ford's Senior management breached their moral, ethical and legal duties to the Company's former Managers by denying requests for a Bridging benefit and concealing from this set of Managers their right to secure this SRP benefit.

15.     SRP Bridging consisted of adding three years of age to LL1 through LL5 Managers who were hired before January 1, 2004 and who had reached age 52 or older and/or adding three years of service credits for these eligible Managers with 10 or more years of service.  These add-ons enabled the eligible Manager to qualify for a "55 and 10" early retirement.  SRP Bridging is also known within the Company as a "3+3 Bridge".

16.     During the 2019 SIRP, Ford granted some Managers an opportunity to Bridge and denied Bridging to other similarly situated Managers, including Plaintiffs.

17.    ERISA prohibits an employer from arbitrarily granting or denying similarly situated eligible employees a retirement benefit, which in this case includes the SRP Bridging rights.

18.    Plaintiffs, unaware of the existence of SRP or their ERISA rights to pursue Bridging benefits, executed releases in order to obtain severance and other benefits from Ford upon termination.

19.    Senior management of the Company served as the SRP Plan Administrators ("Plan Administrators").

20.    The Company, by itself and through its Plan Administrators, had a fiduciary duty to disclose to Plaintiffs and similarly situated former Managers the existence of the SRP and to describe in enough detail their Bridging rights so they could make an informed decision as to their best course of action.

21.    The releases executed by Plaintiffs are invalid and should be set aside because they were secured by the Company through what amounts to fraudulent concealment.

22.    Unlawful age bias was an additional reason motivating Ford to select Plaintiffs for termination.

23.   In addition to the BCG algorithm, Ford used a forced ranking performance evaluation process which was and remains biased against its older Managers.

24.   Specifically, the SIRP process required the selection of employees for termination based in part on performance and projected or potential future performance. The SIRP selections were thus tainted because Ford used an algorithm and performance evaluation tools which were infected with age bias.

25.   This systemic and automated form of age bias made Plaintiffs more vulnerable for separation.

26.   Ford has refused to allow those Managers terminated in the 2019 SIRP from transferring laterally to open positions and it has refused to permit the targeted Managers from taking a lower status position to continue their employment.

27.   Ford is promoting younger Managers to replace Plaintiffs upon separation.

28.   Ford continues to advertise for new employees to be hired into positions that could be handled by the targeted Managers. Managers separated in the 2019 SIRP are not eligible to be considered for open positions.

29.     Plaintiffs request that this Court set aside the releases that they and Class Members executed as a result of Ford's fraudulent concealment and also provide Plaintiff and Class Members equal opportunity to secure retirement benefits, including Bridging as well as other appropriate equitable and legal relief resulting from their wrongful terminations.

## PARTIES, JURISDICTION AND VENUE

30.     Werner Woellecke ("Woellecke") is a resident of Northville, Michigan.

31.     Terry Haggerty ("Haggerty") is a resident of Canton, Michigan.

32.     Ford is a Delaware Corporation headquartered in Dearborn, Michigan.

33.     All the events in controversy occurred in this Judicial District.

34.     The Court has federal question subject matter jurisdiction over Plaintiffs' Section 510 ERISA claims.

35.     The Court has supplemental jurisdiction over Plaintiffs employment discrimination claims under the Michigan Elliott-Larsen Civil Rights Act ("ELCRA") MCL 37.210 *et seq.* because such claims arise out of the same set of facts as Plaintiffs' federal claims such that they form part of the same case or controversy.

36.     Venue is proper in the Eastern District of Michigan because the actions giving rise to this case occurred in Wayne County, Michigan and Ford is a corporation doing business in this judicial district.

37.     Plaintiffs are participants in the Ford GRP and SRP, which are ERISA plan as that term is defined in ERISA.

38.     The Ford GRP and SRP are ERISA Plans subject to §510 of the Employee Retirement Income Security Act ("ERISA").  29 U.S.C. §1140.

39.      Exhaustion of administrative remedies under the GRP and SRP is not required as a pre-condition to filing this action because there are no remedies which are or will be available to resolve any of the issues raised in this complaint and, if any such remedies were available, pursuing them would be futile.

## STATEMENT OF FACTS

**A.     Description of Ford's General Retirement Plan**

40.     Ford's General Retirement Plan ("GRP") was formed in 1950.

41.     The GRP is a traditional, defined benefit pension plan that pays fixed monthly or lump sum retirement pension amounts to eligible Ford employees.

42.     The GRP provides a variety of pension benefits, including regular and early retirement pensions and certain supplemental pension allowances.

43.     But for the termination of their employment, Plaintiffs would have become eligible for the following benefits under the GRP:  (1)  "55 and 10" early retirement, under which they could obtain a full retirement at age 55 with ten years of service;  and (2) the "30 and Out" pension supplement, under which employees with at least 30 years of credited service who take early retirement are eligible for an additional monthly pension payment until the age of 62.

44.     As of December 31, 2017, the GRP had assets of $19,697,120,747; active/eligible participants totaling 16,381; retired or separated participants receiving benefits totaling 32,850; and retired or separated participants eligible to receive future benefits totaling 14,642.

45.     Since the early part of the 2000s, Ford has taken steps to remove from its balance sheet pension obligations that the Company, along with consultants and investors, viewed as debts weighing down its credit rating and stock price.

46.     Since the early 2000s, the Company's pension obligations to current and future retires has exceeded the assets of the GRP.

47.     In 2012, Ford's global pension funds were underfunded by $19 billion.

48.     In 2003, Ford announced that beginning January 1, 2004, the GRP would be closed to new hires and rehires.

49.     In 2012, the Company, to further reduce its pension obligations (also known as "de-risking" its obligations) amended the GRP to provide that retiring participants would now have the option to secure a lump sum payment in lieu of the annuity which provided lifetime monthly benefits to the retiree and his or her surviving spouse.

50.     Thus, under the amended GRP, managers hired before January 1, 2004 with 30 years of Company service were eligible to retire and receive an unreduced lifetime monthly benefit with spousal survivor option, or they could elect to take a lump sum payout at retirement.

51.     As a result of this de-risking program, Ford was able to reduce its underfunded pension obligations from $19 billion in 2012 to $9.8 billion on December 31, 2014.

52.     Beginning in 2012, Ford promoted the lump sum payout option because Ford could effectively de-risk its pension obligations by shifting the risk of an underfunded pension from the Company to the employee.

**B.    GRP and SRP Eligibility Requirements for Full Pension and Health Insurance**

53.    On June 9, 1994, the Company established a Select Retirement Plan ("SRP") for the purpose of providing voluntary retirement incentives to selected Company employees on U.S. payroll who are assigned to Leadership Levels One through Five, or the equivalents of such Leadership Levels, constituting a select group of management or highly compensated employees. The SRP was restated and amended on January 1, 2018.

54.    Under the GRP, Managers such as Plaintiffs, hired before January 1, 2004, who retire at age 55 years old or greater with 10 years or more years of service, are eligible for an unreduced monthly benefit with spousal survivor options or may elect to take a lump sum payout.

55.    Managers and who have 10 years or more of Company service but less than 30 years Company service, or who are under age 55 with less than 30 years of service, will receive a substantially reduced pension.

56.    Retiree Health Care insurance is available to Company employees hired before June 1, 2001 and eligible to retire under the GRP at age 55 or greater with 10 years or more of service or at any age with 30 or more years of Ford Service.

13

57.     Ford Managers hired before January 1, 2004 the SRP permitted Ford to add three years of service and three years of age in order to increase the likelihood of qualification for a full GRP Pension and Health Insurance or qualify for a full GRP Pension and Health Insurance, or other SRP benefits.

**C.     Description of the Ford 2019 SIRP Terminations and the Senior Management use of a Biased Algorithm which Targeted Employees Based on Age and Proximity to Retirement Milestones**

58.     Beginning in 2017, the Company determined that over the next two years it would reduce operations costs and pension liabilities by $25.5 billion.

59.     After the previous determination, the Company cut 7,000 salaried positions globally including salaried employees who took the buyouts offered in the last year, voluntary separations, and the elimination of some positions that were open but not filled. Approximately 20% of the 7,000 eliminated positions would be senior-level managers.

60.     By 2019, the Company still had $11 billion to cut. To accomplish this cut, Ford engaged in "Waves" of involuntary terminations. By May of 2019, Ford had gone through three Waves reducing hundreds of salaried employees in the United States.

61.     Ford retained the services of Boston Consulting Group ("BCG") to

14

develop a headcount and pension reduction plan. This plan was promoted as a High-Tech program designed to modernize Ford and was given the title of "Smart Re-Design."

62.    At the core of the BCG program was a proprietary algorithm that was capable of quickly reviewing information from tens of thousands of personnel records. This automated review system could target certain salaried employees based on characteristics such as age, years of service, date of hire, salary, performance or potential performance ratings, and other data points. Since the process was automated, BCG Project Managers could quickly perform hundreds of trial runs to assist Ford management in achieving its headcount reduction and pension liability goals.

63.    This automated system was deliberately programed to target older and higher pension-cost salaried employees based on legally protected characteristics such as the employee's proximity to retirement benefit milestones and the employee's age. By removing the headcount reduction decision-making from normal channels (i.e. asking an employee's supervisor or Human Resources to decide on the fate of the employee) and delegating the decision making authority to a computer, BCG assured Ford that with a little "sprinkle," the illegal computer controlled selection process could be made to appear to be legitimate.

15

64.     Ford was instructed by BCG Project Managers to "sprinkle" among the high pension cost employees, personnel who did not possess the high pension cost characteristics of those selected, in order to mask the discriminatory impact of the selection process.

65.     On May 21, 2019, the Company implemented the Fourth and Final Wave of involuntary terminations (Salaried Involuntary Reduction Process or SIRP), which will result in approximately 800 involuntary terminations of salaried U.S. employees.

66.     In order to reach its financial cost cutting objectives, the Highest Level of Ford Senior Management directly or indirectly informed those in charge of carrying out the 2019 SIRP to target Managers who were hired before January 1, 2004, thus preventing many Managers from reaching critical GRP pension.

67.     The tactic described above enabled Ford to pay these severed managers a fraction of what they would receive if permitted to reach the Age or Service Milestones.

68.     It is anticipated that there will be testimony from high ranking Ford executives that Senior Management was explicit in their instruction to target SIRP separations Managers who were  hired before January 1, 2004 so that Ford's pension obligations would be reduced or completely de-risked by the separated Manager taking a fraction of his or her full pension as lump sum payment upon retirement.

69.     Ford concealed from Plaintiffs and Class Member Managers their eligibility for a 3+3 Bridge through the SRP.

**D.     Ford Utilized Forced Ranking and Evaluation Tools Tainted by Age Bias in Order to Select Older Managers to be Targeted for Termination as part of the Wave Four 2019 SIRP**

70.     Senior Management instructed those responsible for selecting employees for the 2019 SIRP terminations to utilize the Company's 25 Panel Evaluation Tool and Forced Ranking outcomes to select Managers who were placed in the lower portion of the forced ranking list of evaluated Managers.

71.     For decades, Ford has utilized a forced-ranking employee evaluation procedure that compares individual employees or groups of employees to one another using a pre-specified performance distribution ranking system.

72.     Ford has utilized its forced-ranking procedure for purposes of awarding merit increases and bonuses.

73.     Since the late 1990s, Forced ranking performance evaluation systems required evaluators to rank employees from best to worst and based on that ranking, employment benefits are allocated.

74.     Ford's practice of using a Forced Ranking technique has been found biased against older employees due to the fact that older employees are disproportionately ranked lower while younger employees are disproportionately ranked higher.

75.     The 2019 SIRP termination decisions were not made by Plaintiffs' immediate superiors.

76.     Instead, the termination decisions were made by persons other than Plaintiffs' direct supervisors.

77.     Ford also evaluated Managers pursuant to the Company "Future Contribution Assessment" ("FCA"). The FCA was carried out in secret and managers were often not informed of their FCA ranking.

78.     Older managers were disproportionately denied a high FCA score whereas younger managers and would routinely receive a disproportionately higher ranking.

79.   The Company used an evaluation tool known as "Key Talent." Managers who made the Key Talent list received promotional opportunities which were not available to Managers who did not make the Key Talent list.

80.   In order to be placed on the Key Talent list, a Manager must have enough work life left to secure two promotions.  This means that older Managers who do not have as much work life left would never make the Key Talent list.  This program was and remains infected with age bias because it favors younger Managers over older Managers.

81.   Prior to terminating Plaintiffs' employment under the SIRP, Ford knew or should have known that the SIRP/forced ranking program, the Key Talent and the FCA programs would result in the termination Managers, based on (1) disparate impact analyses and estimates completed by Ford which, if properly performed and validated, showed or would have shown discrimination based on age; (2) Ford's prior experiences with the same or similar forced ranking and evaluation programs that have resulted in the termination of employees based on age; and (3) statistical and other analyses known to Ford showing that its forced ranking process discriminates against older employees based on age.

82.   In selecting Managers for the 2019 SIRP, Ford utilized the results of these programs contaminated by age bias resulting in older Managers disproportionately selected for termination in the 2019 SIRP.

### E.   STATEMENT OF FACTS REGARDING WERNER WOELLECKE

83.   Werner Woellecke ("Woellecke"), born on February 25, 1969, was hired by Ford on January 2, 1992 as a salaried employee.

84.   Woellecke worked continuously for the Company until his involuntary separation occurring on May 31, 2019.

85.   At the time of his involuntary separation, Woellecke had 27.5 years of credited service with the Company and was 50 years old.

86.   At the time of his separation, Woellecke was classified as a LL5 and served as the Controller for the Company's Woodhaven Plant.

87.   Prior to his separation, Woellecke was recognized as a strong performer and contributor earning high praise from his superiors. He received regular promotions, merit increases, bonuses, and other financial rewards because of his outstanding performance.

88.   On May 21, 2019, Woellecke was informed of his separation by his superior Dave Parent ("Parent"), North America Controller for Manufacturing.

89.     On May 21, 2019, Woellecke requested from Parent that Ford bridge him to a 30-year service pension by adding to his service credits 2.5 years.

90.     Woellecke's request for Bridging was denied.

91.     Woellecke was offered severance on condition that he execute a release of claims against Ford.

92.     Neither Parent nor anyone else from the Company informed Woellecke of his right to apply for SRP bridging benefits or to appeal the denial of his request/claim.

93.     If Ford had informed Woellecke of his rights to pursue SRP bridging or to appeal the denial of his request/claim, then Woellecke would have pursued those options and would not have signed the severance agreement offered at the time of termination.

94.     On May 23, 2013, Woellecke spoke with Fox and requested a transfer to Ohio to replace the controller.  Although both Parent and Fox supported the transfer, the request was denied by upper management.

95.     On May 31, 2019, Woellecke, without being informed of any of his ERISA claim and appeal rights under the SRP, executed and returned the Severance Agreement Release.

96.     Woellecke's execution of the release was not a knowing and voluntary waiver of his legal rights.

97.     On June 12, 2019, Woellecke further pursued his ERISA bridging rights under the SRP by sending an email to Parent and Fox:

 Hi Guys,

Hope you guys are well.  Question for you either of you, I am hearing        that a few of my peers that were separated were bridged to either age 55 or 30 years of service through a case review conducted by HR.   My situation at separation was as follows:

Age 50

Service 27 years and 5 months

Request to be demoted to LL6 Controller was denied

Are either of you familiar with this, and was I eligible for review and just not aware? I know both of you tried your best to keep me by sending me to Cleveland, and I appreciate that.  Would you support getting my case reviewed by HR to see if I could be bridged or pass along a contact, I can work with myself? Let me know your thoughts.  Thank you

Regards,

Werner Woellecke

Human Resource responded on June 13, 2019:

Thank you for your email and more importantly all your contributions to Ford. We realize the impact of the redesign of the business can be a very challenging experience, especially for those leaving the Company. While Smart Redesign is an important step forward for Ford, unfortunately it has meant that we must let some Ford employees go, including employees who made valuable contributions to the Company over the years. Please know that we have been very thoughtful in structuring the Smart Redesign separation process to ensure we are treating employees fairly and consistently. The effective date for Wave 4 Smart Redesign Salaried Involuntary Reduction Process (SIRP) separations was established as 5/31/19 and your benefits eligibility is based off of that date. Ford is not in a position to reconsider or extend your separation date to bridge you to retirement eligibility, but it is offering a severance package under SIRP that we hope will help you during this transition, including competitive severance amounts, extended medical benefits, and career transition services through Right Management. Right Management has a high success rate of placement for individuals who elect to continue working, and we encourage you to begin engaging with them. Thank you again for all you have done while at Ford and know you will always be a part of the Ford family

98.     Woellecke was not informed of the existence of the SRP or any of his rights thereunder as a potential beneficiary.

99.     Had Woellecke been informed of his rights under the SRP he would not have agreed to the severance and he would not have given a release of his claims to Ford.

100.   The lump sum value of Woellecke's Ford pension with 27.5 years of service credits is $509,273.  If Ford had provided Woellecke with a bridge to a 30-year service credit the lump sum value of his Ford pension would be in excess of $1.2 million.

### F.   STATEMENT OF FACTS REGARDING TERRY HAGGERTY

101.   Terry Haggerty ("Haggerty"), born on July 3, 1965, (54 years old) began his employment with Ford on October 7, 1991 (27.5 years).

102.   Haggerty worked continuously for Ford until March 31, 2019. As Chief Engineer in Product Development, at age 53, and at a LL 3 level, he was selected for separation as part of the 2019 SIRP.

103.   Prior to his separation, Haggerty was recognized as a strong performer and contributor earning high praise from his superiors and regular promotions, merit increases, bonuses and other financial rewards due to his outstanding performance.

104.   Haggerty's lump sum pension, with 53 years of age and 27.5 years of service, was valued at $865,000. If allowed by the Company to work until September 1, 2020, at age 55, the lump sum value of his pension was $1.633 million.  If allowed by the Company to work until November 1, 2021 with 30 years of service, the lump sum value of the pension would be $1.890 million.

105.   On March 12, 2019, Haggerty was informed of his separation by Chuck Gray, Engineering Director, Electrical & Electronic Systems Engineering in Product Development.

106.   On March 21, 2019 Haggerty requested Bridging from Hau Thai-Tang, Executive Vice President of Product Development, Jim Holland, Vice President Engineering, Sara Orwig, Human Resources Senior Manager and Eric James, Human Resources Manager. Haggerty wrote:

> I am still trying to get over my shock and amazement at being involuntarily separated from the company, and am trying to decide how best to say my final words. I want to accomplish three things with this note, and I hope you'll take the time to read it.
> First, I want to share with you how the involuntary separation has impacted me financially, especially given my age and years of service with the company. Second, I would like to request special consideration when it comes to the SIRP package I received. Lastly, I want to share with you a small snippet of the amazing feedback I've gotten from the hundreds of people who have reached out to me after hearing the news. I am pleased that my time at Ford Motor Company caused me to have a positive impact on other employees, including those I have mentored, and I wish that this could have continued.

I have 27.5 years of service and will turn 54 years old this year. Therefore, I'm not eligible for early retirement, and you are not offering a special early retirement option. Because I can't retire, I lose 50% of my pension lump sum, I lose all unvested RSUs, I have to cash in all vested RSU's within 3 months, I lose a company lease car for life, I lose SERP benefits, and I lose all retiree health care benefits. All of this equates to well over $1M in the near term and other significant losses that will accumulate over time, all because I am being forced to leave one year early. I still find it so hard to believe that for someone who has dedicated over 27 years servicing this company, and has worked in nearly every aspect of the Electrical Engineering organization, that you couldn't find a place in the new Smart Redesign VCSE organization for me.

With that said, I am asking for more compensation as I separate from Ford Motor Company, taking into consideration my lengthy years of service that far exceed the top range of years of service outlined in the present SIRP package. First priority would be to receive a credit for age or years-of-service making me eligible to apply for early retirement. Or, if the company is able to offer a special early option, that would work as well. If there's nothing that can be done regarding retirement eligibility, are you able to offer me incremental severance time or other lump sum payment when I exit? For those with 20 years of service, they are eligible for 9-months' severance, with nearly 28 years of service, can you offer me 18 months' severance or other comparable lump sum payment?

Lastly, I have been emotionally touched by the large number of people who have reached out to me, both verbally and in writing, to share their feelings about my separation. I know from self-reflection that I am not the most outspoken, well spoken, or "flashy" leader compared to many of my peers. And perhaps that's why I was not placed during the Smart Redesign. But, during the 27.5 years of my service and at management ranks from LL6 to LL3, I have had the opportunity to lead teams and have delivered significant and impactful results. I am a very strong leader and manager, as recognized by both my peers and subordinates. Please take the time to read these comments.

I look forward to your response. Please note I am prepared to sign the waiver as soon as I hear back from you.

Sincerely,

Terry Haggerty

107.   On March 28, 2019 Haggerty's request for Bridging was denied.

108.   Haggerty was offered severance on condition that he execute a release of claims against Ford.

109.   No one from the Company informed Haggerty of his right to apply for SRP Bridging benefits or to appeal the denial of his request/claim.

110.   On March 31, 2019, Haggerty, without being informed of his ERISA claim and appeal rights under the SRP, executed and returned the Severance Agreement Release.

111.   If Ford had informed Haggerty of his rights to pursue SRP bridging or to appeal the denial of his request/claim, then Haggerty would have pursued those options and would not have signed the severance agreement offered at the time of termination.

112.   Haggerty's execution of the release was not a knowing and voluntary waiver of his rights. Haggerty was not informed of the existence of the SRP or any of his rights thereunder as a potential beneficiary.

113.   Had Haggerty been informed of his rights under the SRP he would not have agreed to the severance and he would not have given a release of his claims to Ford.

## CLASS ALLEGATIONS

114.    Plaintiffs request certification pursuant to Fed. R. P 23(b)(3) for damages on behalf a class consisting of all former Ford Managers (LL1 through LL5) who are Michigan residents or subject to Michigan law hired before January 1, 2004, executed   a release as part of the 2019 SIRP process and who were terminated within three years of attaining age 55 and who had at least 10 years of credited service and/or who were less than three years short of 30 years of Ford Service and who was not informed of his or her Bridging rights regardless of the Class Members retirement status.

115.    Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(2) on behalf of a proposed injunctive relief class defined as Ford Managers who meet the definition of the damage class and who would benefit from an order of the court granting them the Bridging rights set forth in the SRP and other Ford ERISA Plan language consistent with Bridging rights.

116.    Plaintiffs request certification pursuant to Fed. R. Civ. P 23 (c)(4) on behalf of Class Members who seek a class determination that Ford Managers meeting the damage class definition should have been granted Bridging to their Age or Service Milestone.

117.   The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for injuries sustained and to obtain class wide equitable injunctive relief.

118.   There are questions of law and fact raised by the named Plaintiffs' claims common to those raised by the Class(es) they seek to represent. Such common questions predominate over question affecting only individual members of the Class(es). The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

119.   Class representatives will vigorously prosecute the suit on behalf of the Class; and the Class representatives are represented by experienced counsel. Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation involving employment law issues.

120.   There is no conflict between Class Representatives because for purposes of this lawsuit, higher level Managers did not decide which lower level Managers were selected for the SIRP and higher level managers did not communicate with  lower level Managers information about the existence of the SRP or the Bridging benefits which were available through the SRP.

121.    Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class. The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying  adjudications  with  respect  to individual members of the Class and/or one or more  of the Defendants.

122.  Defendants  have  acted  or  failed  to  act  on  grounds  generally applicable  to  all  Plaintiffs,  necessitating  declaratory  and  injunctive  relief  for  the Class.

123.    A class wide equitable remedy is appropriate here.  This remedy should consist of a court order voiding the releases because they were obtained by fraudulent concealment and the issuance of an order directing the Company to award each Class Member a 3+3 Bridge benefit as provided for in the SRP.

## COUNT I
## VIOLATION OF ERISA §510

124.    Plaintiffs incorporate by reference all the allegations contained above.

125.   Section 510 of ERISA, 29 U.S.C. §1140, makes it unlawful "[f]or any person to discharge, fine, suspend, expel, discipline or discriminate a participant or beneficiary… for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, [or] this title." 29 U.S.C. §1140.

126.   The prohibitions of § 510 are aimed primarily at preventing employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights.

127.   By its terms, § 510 protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting. However, the protections of § 510 are not limited to vested pension rights. The Sixth Circuit has clarified that § 510 prohibits interference with rights to which an employee 'may become entitled' under 'an employee benefit plan' and does not limit its application to benefits that will become vested.

128.   Unlawful interference under Section 510 includes terminating an employee in order to interfere with the employee's ability to receive future benefits under an ERISA plan.  ERISA Section 510 was designed to protect the employment relationship which gives rise to an individual's pension rights. This means that a fundamental prerequisite to a § 510 action is an allegation that the employer-

31

employee relationship, and not merely the pension plan, was changed in some discriminatory or wrongful way.

129.   In this case, Ford intentionally terminated Plaintiffs' employment pursuant to the SIRP in order to interfere with Plaintiffs' ability to receive identifiable ERISA Plan benefits, specifically (1) "55 and 10" early retirement benefits under the GRP; (2) "30 and Out" supplemental benefits" under the GRP; and (3) "3+3 Bridge" benefits under the SRP.

130.   In selecting employees for termination under the SIRP, Ford utilized an algorithm constructed to target employees for termination based on proximity to age or service milestones.

131.   There is evidence that Ford was concerned about high GRP legacy costs attributable to older employees, such as Plaintiffs, who were close to attaining full GRP benefits in the form of "55 and 10" or 30-year retirement benefits.   Both internally and publicly, Ford expressed its worry about increasing pension liabilities in the form of pension benefits that would be payable to aging management level employees, including Plaintiffs, who were approaching but still short of their "55 and 10" early retirement benefits and "30 and out" supplemental pension benefits.

132. The highest members of Ford Senior management expressed the intention and gave directives to terminate employees in the SIRP process if they were hired before January 2004, because they participated in the GRP and would become eligible for additional GRP benefits if their employment continued.

133. Ford's intention to terminate Plaintiffs and others based on their eligibility for additional GRP benefits is further demonstrated by the fact that Plaintiffs and other similarly-situated employees were terminated and purportedly replaced by older employees, who were selected by Ford in order to "sprinkle" the SIRP decisional units for the purpose of making it appear that the separation process was not infected with age bias.

134. In fact, the older employees who were retained had already reached their age and/or years of service milestones under the GRP, and Ford therefore achieved its goal of discriminating against Plaintiffs and others who would become eligible for additional GRP benefits, while at the same time making it appear that it did not discriminate against Plaintiffs based on age.

135. This aspect of the Smart Redesign and SIRP termination process violated ELCRA, which prohibits discrimination based on age, regardless of whether the plaintiff-employee is younger or older than the similarly-situated employees who were not selected for termination.

136.    When Plaintiffs and other employees inquired with Ford about the availability of Bridging rights, Ford deliberately concealed their rights under the SRP, which would have afforded them "3+3 Bridging" to preserve their GRP early retirement and supplemental pension benefits.

137.    These acts of concealment were carried out in conjunction with the SIRP as part of the formal process for terminating Plaintiffs' employment under the SIRP.

138.    Ford's intention to interfere with the Plaintiff's GRP and SRP benefits was a determining factor in its decision to terminate Plaintiffs' employment in the SIRP.

139.    Plaintiffs were all approaching vesting in full GRP benefits, and this proximity to vesting provides an inference of intentional, prohibited interference in violation of 510.

140.    Plaintiffs have standing to bring their § 510 claims against Ford because they are employees or former employees of Ford who are or may become eligible to receive a benefit from the GRP, an employee benefit plan, and are therefore "participants" in the GRP.

141.   As a result of Ford's violation of Section 510 of ERISA, 29 U.S.C. §1140, Plaintiffs have suffered and will continue to suffer damages in the form of lost salary and benefits, including GRP benefits.

142.   Accordingly, to redress the violations of ERISA §510 alleged in this action, Plaintiffs request the following relief from this Court:

a.   A declaration that the GRP is an ERISA plan;

b.   A declaration that the SRP is an ERISA plan

c.   A declaration that Ford violated Plaintiffs' rights under §510 of ERISA when it terminated Plaintiff's employment in order to interfere with their ability to receive future benefits under the GRP;

d.   A declaration that Ford violated Plaintiffs' rights under §510 of ERISA when it terminated their employment and concealed their rights to "3+3 Bridging" under the SRP;

e.   An equitable order of reinstatement to their prior positions or to comparable positions of employment with Ford, or an equitable order of front pay in lieu of reinstatement;

f.   An order of equitable relief awarding GRP benefits, or other monetary compensation, in order to make Plaintiffs whole;

g.      An order of any other equitable and/or legal relief the court

deems necessary to enforce Plaintiffs' rights under ERISA,

including but not limited to an order requiring Ford to provide

Plaintiffs "3+3 Bridging" under the SRP; and

h.      An award of attorneys' fees and costs.

## COUNT II
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT
## DISPARATE TREATMENT – AGE DISCRIMINATION

143.   Plaintiffs incorporate by reference all the allegations contained above.

144.    At all relevant times, Ford was Plaintiff's employer within the meaning

of the ELCRA, MCL §37.2201(a).As an employer under the ELCRA, Ford is

prohibited from limiting, segregating or classifying an employee in a way that

deprives or tends to deprive the employee of an employment opportunity because of

the individual's age, or to otherwise discriminate against an individual with respect

to employment, compensation or a term, condition or privilege of employment

because of the individual's age.

145.   In violation of the statutory duties set forth in the ELCRA,  Ford

discriminated against Plaintiffs in the way it targeted them for termination as part of

the Company's SIRP/forced ranking reduction-in-force program which caused the

company to terminate employees on the basis of age.

146. In further violation of its duty, the utilization of the SIRP/forced ranking reduction-in force program and a discriminatory algorithm resulted in older salaried employees, including Plaintiffs, receiving less favored treatment than similarly-situated younger employees, resulting in their termination from employment.

147. Prior to terminating Plaintiffs' employment under the SIRP, Ford knew or should have known that the SIRP/forced ranking program and the discriminatory algorithm would result in the termination of employees based on age, based on (1) disparate impact analyses and estimates completed by Ford which, if properly completed, showed or would have shown discrimination based on age; and (2) Ford's prior experiences with the same or similar forced ranking programs that have resulted in the termination of employees based on age.

148. The Company's policies as described in the Complaint constitute a pattern and practice of discrimination because the unlawful discrimination was a regular procedure or policy of the Company as evidenced by the Company's history of using forced ranking systems which have been proven to be highly discriminatory toward its older employees.

149.   In the alternative, Plaintiffs and other similarly-situated employees were terminated and purportedly replaced by older employees, who were selected by Ford in order to "sprinkle" the SIRP decisional units for the purpose of making it appear that the separation process was not infected with age bias.

150.   In fact, the older employees who were retained had already reached their age and/or years of service milestones under the GRP, and Ford therefore achieved its goal of discriminating against Plaintiffs and others who would become eligible for additional GRP benefits, while at the same time making it appear that it did not discriminate against Plaintiffs based on age.

151.   This aspect of the Smart Redesign and SIRP termination process violated ELCRA, which prohibits discrimination based on age, regardless of whether the plaintiff-employee is younger or older than the similarly-situated employees who were not selected for termination.

152.   Accordingly, Plaintiffs request the following relief from this Court:

   a.   An order of this Court declaring that the SIRP/forced ranking reduction-in-force program utilized by FMC to select individuals for layoff violates the ELCRA and enjoining the further application of said policies and practices;

   b.   An order of this Court awarding Plaintiffs all economic losses, lost wages and benefits, and other forms of compensation, economic and non-economic damages, past and future, resulting from the discriminatory treatment described in this Complaint;

c. An order of this Court reinstating Plaintiffs to employment with Ford in positions comparable to those which they held at the time they were terminated;

d. An order of this Court awarding interest, costs and attorney fees; and

e. An order of this Court awarding such other relief as this Court deems just and equitable.

## COUNT III
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT
## DISPARATE IMPACT – AGE DISCRIMINATION

153. Plaintiffs incorporate the above allegations as if stated in full herein.

154. The implementation of the SIRP/forced ranking reduction-in force program and the use of an algorithm, while purportedly designed to be "neutral," violates the ELCRA's prohibition against age discrimination in that its application had a disparate impact on the Company's older salaried employees considered for separation.

155. As a direct result of the disparate impact on the basis of age, Plaintiffs have suffered, and will continue to suffer, all of the injuries and damages as set forth above.

156. Accordingly, Plaintiffs request the following relief from this Court:

a.    An order of this Court declaring that the SIRP/forced ranking reduction-in-force program utilized by FMC to select individuals for layoff violates the ELCRA and enjoining the further application of said policies and practices;

b.    An order of this Court awarding Plaintiffs all economic losses, lost wages and benefits, and other forms of compensation, economic and non-economic damages, past and future, resulting from the discriminatory treatment described in this Complaint;

c.    An order of this Court reinstating Plaintiffs to employment with Ford in positions comparable to those which they held at the time they were terminated;

d.    An order of this Court awarding interest, costs and attorney fees; and

e.    An order of this Court awarding such other relief as this Court deems just and equitable.

**COUNT IV**
**RECISSION OF RELEASE OF CLAIMS BASED ON FRAUDULENT CONCEALMENT**

157.   Plaintiffs incorporates the above allegations as if stated in full herein.

158.   The release of claims executed by Woellecke and Haggerty was not knowingly and voluntarily given because Ford concealed from them the existence of the SRP and the opportunity for an SRP Bridging benefit.

159.   Given the fiduciary nature of Ford's relationship with Plaintiffs, Ford had the legal duty to properly advise Managers of their Bridging benefits rights and/or the appeal rights if a claim for benefits is denied.

160.    Under such circumstances, the concealment of the true facts and the deliberate creation of false impressions and inferences is the equivalent of an express and intentional misrepresentation.

161.    Because Woellecke and Haggerty were ERISA beneficiaries or participants under the SRP, Ford had a fiduciary relationship with them which required Ford to provide material information about Bridging benefits if Ford knew or should have known that the failure to provide the information would be harmful to Woellecke and Haggerty's financial interests.  In violation of this fiduciary duty, Ford failed to provide material information about Bridging benefits at a time that Ford knew or should have known that its failure to provide the information was in fact harmful to Woellecke and Haggerty's financial interests.

162.    Ford made a material misrepresentation when it rejected Plaintiffs' request for a Bridging Benefit and failed to disclose to them the existence of the SRP and the appeal rights available to a Manager whose application for a Bridging benefit has been denied.

163.    Woellecke and Haggerty detrimentally relied on Ford's false representation that no right to a Bridging benefit existed.  If Woellecke and Haggerty had been fairly and properly informed of the existence of the SIRP or their right to make a formal complaint to pursue appeal rights if their claim was denied, they would not have executed the Release of claims.

## COUNT V
## BREACH OF FIDUCIARY DUTIES UNDER ERISA

164.    Plaintiffs incorporate the above allegations as if stated in full herein.

165.    Woellecke and Haggerty were beneficiaries and participants under the SRP

166.    As Plan Administrator, Ford is subject to the high standards of fiduciary duties imposed on administrators of an ERISA Plan.  29 U.S.C.§1104(a)(1).

167.    ERISA fiduciaries are required to provide participants complete and accurate information in response to participants questions

168.    Once an ERISA beneficiary or participant has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even if that requires conveying information about which the beneficiary did not specifically inquire.

169. An ERISA fiduciary has an affirmative duty to inform a beneficiary or participant about his or her rights under an ERISA Plan if the fiduciary knows that silence might be harmful.

170. As an ERISA fiduciary, Ford was obligated to refrain from arbitrary and discriminatory conduct in awarding or not awarding Bridging opportunities to its Managers who were separated as part of the 2019 SIRP.

171. Ford was aware of Woellecke's and Haggerty's request that they be Bridged to for age and/or service credit reasons.

172. The release of claims set forth in Plaintiffs' severance agreements is invalid because it was obtained through fraudulent concealment and will be set aside for that reason.

173. Ford breached its fiduciary duties to Woellecke and Haggerty when it failed to:

a.   Inform Woellecke and Haggerty of the existence of the SRP;

b.   Inform Woellecke and Haggerty that they were an Eligible Executives; under Section 2.12 of SRP meeting all criteria except for sub-part (v) (selected to participate);

c.    Inform Woellecke and Haggerty that they had a right to make a formal claim under the SRP requesting that they be selected for a Bridging benefit;

d.    Inform Woellecke and Haggerty that in the event their formal claim was denied that they had appeal rights.

174.   A prudent fiduciary acting in the best interests of its beneficiary would have advised Plaintiffs to pursue a formal claim for bridging under the SRP and to appeal any denial of that claim, especially in light of the fact that Ford was arbitrarily awarding or not awarding bridging to Managers who were separated as part of the 2019 SIRP.

175.   In violation of its fiduciary duties as set forth above, Woellecke and Haggerty were denied an opportunity for a 3+3 Bridge and as a result of the breach of these duties they have and will continue to experience substantial economic losses.

## REQUEST FOR RELIEF

Accordingly, Woellecke and Haggerty request for themselves and the Class they purport to represent the following relief:

a.    An order awarding Woellecke and Haggerty and qualified Class Members all the relief requests set forth in Counts I through V.

b.      An order that each Plaintiff and Class Member receives a 3+3 Bridge

and adjusting the lump sum value of his pension accordingly;

c.      An order setting aside the release of claims that Plaintiffs and Class

members executed because it was not a knowing and voluntary waiver

and product of fraudulent concealment;

d.      An order awarding Plaintiffs and Class members damages caused by

the breach of ERISA fiduciary duties and the ensuing wrongful

termination;

e.      An order awarding Woellecke, Haggerty and Class Members attorney

fees and costs of litigation;

f.      An order awarding Plaintiffs and Class Members such other relief as

the court deems appropriate.

Respectfully submitted,
Pitt, McGehee, Palmer and Rivers PC

By: */s/ Michael L. Pitt*
Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Attorneys for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
mpitt@pittlawpc.com
mbonanni@pittlawpc.com

Kevin M. Carlson PLLC
Kevin M. Carlson (P67704)
Attorney for Plaintiffs
P.O. Box 6028
Plymouth, MI 48170
(734) 386-1919 (phone/fax)
kevin@kevincarlsonlaw.com

Date:  August 16, 2019

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WERNER WOELLECKE, TERRY HAGGERTY
individually and on behalf of
similarly situated LL1 through LL5
former Ford Motor Company managers

**CLASS ACTION**

    Plaintiffs,                                  Case No.

vs.                                              Hon.

FORD MOTOR COMPANY,
a Delaware Corporation,

    Defendant.

---

Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Pitt, McGehee, Palmer and Rivers PC
Attorneys for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
mpitt@pittlawpc.com
mbonanni@pittlawpc.com

Kevin M. Carlson (P67704)
Kevin M. Carlson PLLC
Attorney for Plaintiffs
P.O. Box 6028
Plymouth, MI 48170
(734)386-1919 (phone/fax)
kevin@kevincarlsonlaw.com

---

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as to all issues raised in this action.

Respectfully submitted,

Pitt, McGehee, Palmer and Rivers PC

By: */s/ Michael L. Pitt*
Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Attorneys for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
mpitt@pittlawpc.com
mbonanni@pittlawpc.com

Kevin M. Carlson PLLC
Kevin M. Carlson (P67704)
Attorney for Plaintiffs
P.O. Box 6028
Plymouth, MI 48170
(734) 386-1919 (phone/fax)
kevin@kevincarlsonlaw.com

Date:  August 16, 2019