UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WERNER WOELLECKE and TERRY HAGGERTY
individually and on behalf of
similarly situated LL1 through LL5
former Ford Motor Company managers,

      Plaintiffs,

vs.

FORD MOTOR COMPANY,
a Delaware Corporation, the
Committee of the Select Retirement Plan,
the Plan Administrator of the Salaried
Involuntary Reduction Process, the
Plan Administrator of the General
Retirement Plan, and John Does
as delegated fiduciaries of the
Select Retirement Plan, the Salaried
Involuntary Retirement Process,
and the General Retirement Plan,

      Defendants.

**CLASS ACTION**
Case No. 19-cv-12430
Hon. Bernard A. Friedman

---

**SECOND AMENDED COMPLAINT FOR ERISA BENEFITS,
INJUNCTIVE AND DECLARATORY RELIEF AND MONEY DAMAGES
JURY DEMAND**

Plaintiffs Werner Woellecke ("Woellecke") and Terry Haggerty

("Haggerty"), individually and on behalf of a class of Ford Motor Company

("Ford" or "Company") similarly situated former LL1 through LL5 managers,

bring claims against defendants Ford Motor Company, the Committee of the

Select Retirement Plan (the "SRP") (the "Committee"), the Plan Administrator of the Salaried Involuntary Reduction Process (the "SIRP") (the "SIRP Plan Administrator"), the Plan Administrator of the General Retirement Plan (the "GRP Plan Administrator") and the John Does to whom the Committee and the SIRP and GRP Plan Administrators delegated fiduciary functions as permitted under the SRP and the SIRP (collectively "Defendants"), seeking plan reformation and other injunctive relief for violations of the Employee Retirement Income Security Act ("ERISA") arising out of their and wrongful terminations for the following reasons:

## INTRODUCTION

In this putative class action, Plaintiffs Werner Woellecke ("Woellecke") and Terry Haggerty ("Haggerty") allege that they and other similarly situated retirees or retirement-eligible  LL1s through LL5s who were hired before January 1, 2004, and who were either at least 52 years old and/or very close to reaching an important Ford pension age and service credit marks ("Milestones"), were deliberately denied ERISA "Bridging" benefits and unlawfully targeted for separation in violation of ERISA, 29 U.S.C. §1001 et seq., and state and federal age discrimination laws. This case is a companion case to *Dowhan et al v Ford Motor Company*, Eastern District of Michigan 19-cv-11923 (Hon. Bernard Freidman).

The remedies sought by these Plaintiffs include prospective injunctive and declaratory orders restoring to them ERISA Bridging benefits which will enable them to reach important Ford pension Milestones, an award of compensation for the harm caused by their wrongful terminations, and such other relief as this Court deems just and equitable.

Ford violated its ERISA fiduciary duty arising under ERISA §404(a), 29 U.S.C. §1104(a), to monitor the plan fiduciaries whom it appointed. For purposes of ERISA, Ford is a "person" and at all relevant times hereto the employer of Plaintiffs subject to obligations under ERISA §510, 29 U.S.C. §1140, not to interfere with Plaintiffs' ERISA-governed benefits and under ERISA §204(g), 29 U.S.C. §1054(g), not to engage in plan amendment in violation of ERISA. Defendants violated ERISA fiduciary duties to Plaintiffs when they 1) through plan amendment, whether formal or informal, and through plan interpretation and otherwise, violated the anti-cutback rule in ERISA §204(g), 29 U.S.C. §1054(g); 2) concealed from Plaintiffs their ERISA Bridging rights as participants in Ford's ERISA-governed plans (including without limitation the SRP) containing, through repeated offerings over time, such Bridging rights and the amendments and material modifications of those rights in violation of ERISA §204(h), 29 U.S.C. §1054(h); 3) misrepresented the availability of those benefits and eligibility rights to Plaintiffs and failed to apprise Plaintiffs of plan

3

provisions on which Defendants relied and of the claims procedures under the SRP and SIRP in violation of ERISA §§101, 102, 104(b), 404(a), and 503, 29 U.S.C. §§1021, 1022, 1024(b), 1104(a), and 1133; and 4) terminated Plaintiffs with the specific intent of interfering with their attainment of Milestones and thus interfering with their rights under the SRP -- all causing Plaintiffs harm, for which Plaintiffs seek appropriate equitable relief pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), enforced exclusively in federal court.

By wrongful conduct, Defendants fraudulently induced Plaintiffs to execute an unconscionable release and waiver of claims in exchange for enhanced severance in lieu of otherwise minimal severance benefits. Plaintiffs seek to set aside such fraudulently induced and unconscionable releases and waivers of claims through the equitable remedy of rescission.

The waivers contain an arbitration provision which expressly excludes from the arbitration purview claims regarding the provision of ERISA benefits and claims for injunctive relief.  The waivers also contain an express reference to the courts to decide the enforceability of the class action waiver. Notwithstanding these express exclusions and reference to judicial review, Ford has previously argued that this court lacks the authority to decide the issues presented in Plaintiffs' First Amended Complaint and will presumably so argue in opposition to this Second Amended Complaint. Plaintiffs seek a

declaratory judgment that they were fraudulently induced to enter into the unconscionable and over-reaching arbitration agreements, and that in any event the claims presented here are properly excluded from arbitration under the express provisions of the releases.

## Parties, Jurisdiction and Venue

1.      Woellecke is a resident of Northville, Michigan.

2.      Haggerty is a resident of Canton, Michigan.

3.      The SRP is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(21)(A).

4.      The SIRP is, at a minimum, an "employee welfare benefit plan" within the meaning of ERISA §3(3), 29 U.S.C. §1002(3), and is an "employee pension benefit plan" within the meaning of ERISA §3(2)(B), 29 U.S.C. §1002(3)(B) and applicable regulations.

5.      The General Retirement Plan (the "GRP") is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(21)(A).

6.      Plaintiffs are participants and beneficiaries in the SIRP and the GRP and are participants or former participants in the SRP.

7.      Ford is a Delaware Corporation headquartered in Dearborn, Michigan and is a fiduciary and/or a *de facto* fiduciary within the meaning of

ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) because, inter alia, it appoints (through its Board of Directors and/or a Board committee) the plan fiduciaries of the ERISA-governed plans at issue in this lawsuit, including without limitation the SRP, the SIRP and the GRP, and has a corresponding duty to monitor those plan fiduciaries.

8.     The Committee of the SRP is a fiduciary and/or a *de facto* fiduciary within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), because the Committee is the Named Fiduciary and is designated the Plan Administrator under the SRP and exerts management and control over the assets of the SRP and/or administers the SRP.

9.     The Plan Administrator of the SIRP is a fiduciary and/or a *de facto* fiduciary within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), because the Plan Administrator is the Named Fiduciary and/or is designated the Plan Administrator under the SIRP and exerts management and control over the assets of the SIRP and/or administers the SIRP.

10.     The Plan Administrator of the GRP is a fiduciary and/or a *de facto* fiduciary within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), because the Plan Administrator is a Named Fiduciary of the GRP and because the Plan Administrator exerts management and control over the assets of the GRP and/or administers the GRP.

11.    The Defendant John Does are fiduciaries and/or a *de facto* fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), because they are the administrators to whom the Committee and/or the Plan Administrators under the SIRP, the SRP and/or the GRP have delegated fiduciary functions as permitted under the terms of those plans.

12.    All the events in controversy occurred in this Judicial District.

13.    The Court has federal question subject matter jurisdiction over this matter under ERISA and under the federal Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq*. claims, pursuant to 28 U.S.C. § 1331.

14.    This Court has exclusive jurisdiction over Plaintiffs' ERISA and federal common law claims pursuant to ERISA §§510 and 502(a)(3), 29 U.S.C §§1140 and 1132(a)(3) and (e).

15.    Plaintiffs have exhausted all agency exhaustion requirements under the ADEA.

16.    The Court has supplemental jurisdiction over Plaintiffs' employment discrimination claims under the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.210 *et seq*., because such claims arise out of the same set of facts as Plaintiffs' federal claims such that they form part of the same case or controversy, pursuant to 28 U.S.C. §1367.

17.    Venue is proper in this district, pursuant to 28 U.S.C. §1391 and 29 U.S.C. §1132(e), under ERISA's national venue provision and/or because the SRP and the SIRP and the GRP are administered in this judicial district and/or because a substantial part of the events or omissions giving rise to these ERISA claims and federal common-law claim occurred and continue to occur in  this judicial district.

18.    Exhaustion of administrative remedies under the SIRP, the GRP and the SRP is not required as a pre-condition to filing this action because of the procedural defects in the responses of the Committees and/or the Plan Administrators or their delegatees in response to Plaintiffs' seeking ERISA Bridging benefits, and because there are no remedies which are or will be available to resolve any of the issues raised in this Second Amended Complaint and, if any such remedies were available, pursuing them would be futile.

19.    Furthermore, exhaustion must be excused because:  (1) Plaintiffs did not have access to any document detailing the provisions of the SRP, or providing for administrative review of the denial of a claim for bridging benefits; (2) Plaintiffs were not otherwise informed of the existence of the procedures for pursuing administrative claims; (3) Defendants did not provide Plaintiffs or other participants with summaries of the SRP's provisions for resolving claims regarding benefits; (4) when Plaintiffs did in fact inquire about

8

their rights to bridging benefits, nothing came of them; (5) Defendants misled

Plaintiffs by informing them that bridging was not available; and (6)

Defendants did not inform Plaintiffs of any prescribed procedures for pursuing

or appealing claims regarding their eligibility for benefits.

## STATEMENT OF FACTS

### A. Ford Targeted Plaintiffs for Separation Because of Their Ages and Proximity to Retirement Milestones and Concealed from Them Their Right to Participate in A Bridging Retirement Plan

20.     In order to reduce operating expenses and reduce debt and pension

liabilities, Ford selected employees for termination and amended its long-

standing ERISA-qualified pension plans via a Salaried Involuntary Reduction

Process ("SIRP") to be carried out in Four Waves.

21.     With the specific intent of targeting participants in the SRP and GRP

who were about to achieve Milestones, Ford retained the services of Boston

Consulting Group to develop a headcount and pension reduction plan to deal

with Ford's pension liabilities (the "BCG Plan").

22.     The BCG Plan was promoted as a High-Tech program designed to

modernize Ford and was given the title of "Smart Redesign."

23.     At the core of the BCG Plan was a proprietary algorithm that was capable of quickly reviewing information from tens of thousands of personnel records.

24.     This automated system was deliberately programmed to target older and higher pension-cost salaried employees based on legally protected characteristics including the employee's proximity to retirement benefit Milestones or the employee's age.

25.     Plaintiffs and the other LL1 through LL5 managers ("Managers") were separated in one of the Four Waves ending on May 31, 2019.

26.     Plaintiffs are Managers who were selected for separation in the 2019 SIRP for the purpose and with the specific intent of preventing them from reaching important pension Milestones which would have allowed them to receive greater retirement benefits and consequently would have increased Ford's pension obligations to its former managers.

27.     Managers such as Plaintiffs, hired before January 1, 2004, were participants in the GRP.  Milestones for full retirement benefits per the terms of the GRP included a supplemental benefit upon attaining 30 years of Ford Service, regardless of age ("Service Milestone" or "30 and out") or attaining the age of 55 and at least 10 years of Ford Service, thus entitling the employee to an early retirement benefit ("Age Milestone" or "55 and 10").

10

28.     The Managers involved in this lawsuit have either witnessed or participated in decades of reductions in force ("RIFs").  In most if not all these RIFs, Defendants routinely cushioned the economic harm caused by the separation of a long-term Manager by offering to them various Bridging options either on an *ad hoc* basis or pursuant to a RIF plan.

29.     The custom and practice of Defendants before 2019 was to make Bridging an open and transparent process designed to be available to as many Managers as possible.

30.    In the decades before 2019, Ford prided itself in the use of Bridging mechanisms to mitigate the economic harm caused by the separation its long-serving Managers.

31.    The transparency of the practice of offering Bridging benefits on a widespread basis ended in 2019. With the aid of the BCG algorithm, Ford terminated Plaintiffs for the purpose and with the specific intent of preventing them from attaining their "30 and Out" supplemental benefit and "55 and 10" early retirement benefit, or both.

32.    By informal amendment through plan interpretation by some or all of the Defendants and/or by formal amendment uncoupling the enhanced-severance-benefits-in-exchange-for-release provision from the SRP and the GRP into a separate ERISA-governed plan, the SIRP, which is at a minimum an "employee welfare benefit plan" within the meaning of ERISA §3(3), 29 U.S.C. §1002(3), and/or an "employee pension benefit plan" within the meaning of ERISA §3(2)(B), 29 U.S.C. §1002(3)(B) and applicable regulations.

33.    By terminating its Managers to prevent them from attaining one or both Milestones, Ford significantly reduced the employee's lifetime retirement benefits and significantly improved its balance sheet by reducing its ongoing pension obligations.

34.    The impact on Ford's long-term Managers terminated short of their Age and Service Milestones has been financially devasting.

35.    In one case presented in this Second Amended Complaint, a terminated Manager's lump sum pension at 53 years of age and 27.5 years of service has been valued at $865,000. If the Company bridged or permitted him to work until September 1, 2020, reaching age 55, the lump sum value of his pension would be $1.633 million.  If the Company bridged or permitted him to work until November 1, 2021 and thereby attaining 30 years of service, the lump sum value of his pension would be $1.890 million.

36.    Many Managers who were notified of their impending terminations and who were close to reaching either a Service or Age Milestone, including Plaintiffs, requested that Ford Bridge them to one or both Milestones.

37.    Bridging could be accomplished in several ways.  The simplest form of Bridging would be to delay the Manager's termination date until he or she reached a pension Milestone. This *ad hoc* form of Bridging has been and remains widespread within the Company.

38.    A more formal form of Bridging would be for the Company to add to the employee's age or years of service so the Manager would reach an important pension Milestone.

39.   Not every request made in the 2019 SIRP for formal or informal Bridging to a Milestone was denied.

40.   Some Managers separated in the 2019 SIRP were secretly granted informal or formal Bridging.

41.   The 2019 Bridging benefits have been secretly provided to select separated Managers on a "who you know" basis.

42.   When Plaintiffs heard that some requests for Bridging were being granted, they asked for the same favorable treatment.

43.   Plaintiffs' requests for Bridging were denied without explanation or disclosure of the company's SRP Plan, described below, which would have permitted Plaintiffs to participate in Bridging.

44.   On June 9, 1994, the Company established a Select Retirement Plan ("SRP") for the purpose of providing Bridging rights and incentives to Managers assigned to LL1 through LL5 classifications and who meet age and service requirements and who are "selected" by Ford for the Bridging benefit.

45.   The SRP was restated and amended on several occasions with the last revisions occurring in 2017 and 2018.

46.   The 2017 /2018 amendments drastically reduced or eliminated entirely the Bridging rights for Plaintiffs and Class Members meeting the eligibility requirements for a Bridging opportunity under the SRP. These Bridging rights are identified as "Select Benefits" under the SRP. The benefits provided in the SRP relate to the Ford General Retirement Plan and are designed to allow employees to reach milestones for early retirement subsidies under the GRP.  Thus, in Section 4.01 of the SRP, the SRP purports to provide the following GRP Select Benefits:  (1)  Adding three years to the participant's attained age as of their effective retirement date; and (2) adding three years to the participant's years of credited service and contributory service as of their effective retirement date.

47.   The 2017/2018 amendments to the SRP created a selection process whereby a Manager can be identified as a "Specified Employee" pursuant to Section 2.33 of the SRP.

48.   A Manager selected to participate as a Specified Employee by December 31, 2018 had the right to participate in Bridging benefit plan if separated within 12 months of being identified as a Specified Employee.

49.   Eligible LL1through LL5 Managers who are three years away from the Service credit Milestone or Age Milestone would have a substantial interest in participating in the SRP as a Specified Employees.  These employees could

15

participate in the SRP as a Specified Employee by self-identification or requesting identification by senior management.

50. The 2017/2018 amendments also created additional benefits known as Special Select Benefits. Special Select Benefits authorized the Company to pay Eligible Managers additional retirement benefits up to 35 years of service.

51. Eligible Managers selected for participation for a Special Select Benefit are placed on an SRP Appendix A List prior to the receipt of the Special Select Benefit.

52. Eligible Managers who are denied the right to participate in the Select Benefit or Special Select Benefit program can file an administrative appeal challenging the denial of a request to participate, but only if they are aware of the plan and its administrative claims procedures.

53. ERISA's disclosure requirements require the Defendant plan administrators to publish to participants and pension plan beneficiaries of the SRP, including Plaintiffs, a Summary Plan Description ("SPD") and Summary of Material Modifications ("SMM"). ERISA §§101, 102, and 104(b), 29 U.S.C. §§1021, 1022, and 1024(b).

54. Instead of complying with the disclosure requirements of ERISA, Defendants deliberately concealed the existence of the SRP from its

16

participants and pension beneficiaries and misrepresented the existence and

nature of bridging benefits from Plaintiffs, even after Plaintiffs inquired about

their eligibility for bridging benefits.

55.    Defendants kept the existence of the SRP secret so that Bridging

could be minimized and, at the same time, doled out on a limited basis on a "who

you know" basis.

## B. Description of the Ford 2019 SIRP Terminations and Senior Management's Use of a Biased Algorithm which Targeted Employees Based on Age and Proximity to Retirement Milestones

56.    At Ford's direction, the automated BCG system to be used in the

administration of the SRP, the GRP, and the SIRP was deliberately programed

to target older and higher pension-cost salaried employees based on legally

protected characteristics such as the employee's proximity to retirement

benefit milestones and the employee's age.

57.    By removing the headcount reduction decision-making from

normal channels (i.e. asking an employee's supervisor or Human Resources to

decide on the fate of the employee) and delegating the decision-making

authority to a computer, BCG assured Ford that with a little "sprinkle," the

illegal selection process could be made to appear to be legitimate.

58.    Ford was instructed by BCG Project Managers to "sprinkle"

among the high pension cost employees personnel who did not possess the

high pension cost characteristics of those selected, in order to mask the discriminatory impact of the selection process.

59. On May 21, 2019, the Company implemented the Fourth and Final Wave of involuntary SIRP terminations resulting in approximately 800 involuntary terminations of salaried U.S. employees.

60. In order to reach its financial cost cutting objectives through the plan administration of the SRP, the GRP, and the SIRP, Defendants directly or indirectly informed those in charge of carrying out the 2019 SIRP to target Managers who were hired before January 1, 2004, thus preventing many Managers from reaching critical GRP pension milestones.

61. The tactics described above enabled Defendants to reduce the ERISA-governed benefits Plaintiffs a fraction of what they would have received if they were permitted to reach the Age or Service Milestones provided to similarly situated managers through informal bridging during the Fourth Wave and formal bridging repeated so often during prior RIFS that the Age or Service Milestones had become a permanent fixture in Defendants' retirement plans for similarly situated managers.

62. It is anticipated there will be testimony that Senior Management John Doe Defendants and some or all of the remaining Defendants were explicit in their instruction to target SIRP separations Managers who were hired before

January 1, 2004 so that Ford's pension obligations would be reduced or completely de-risked by the separated Manager taking a fraction of his or her full pension as lump sum payment upon retirement.

**C. Ford Utilized Forced Ranking and Evaluation Tools Tainted by Age Bias in Order to Select Older Managers to be Targeted for Termination as part of the Wave Four 2019 SIRP**

63.     Senior Management John Doe Defendants and some or all of the remaining Defendants instructed those responsible for selecting employees for the 2019 SIRP terminations to utilize the Company's 25 Panel Evaluation Tool and Forced Ranking outcomes to select Managers who were placed in the lower portion of the forced ranking list of evaluated Managers.

64.     For decades, Ford has utilized a forced-ranking employee evaluation procedure that compares individual employees or groups of employees to one another using a pre-specified performance distribution ranking system.

65.     Ford has utilized its forced-ranking procedure for purposes of awarding merit increases and bonuses.

66.     Since the late 1990s, forced ranking performance evaluation systems required evaluators to rank employees from best to worst and based on that ranking, employment benefits are allocated.

67.     Ford's practice of using a Forced Ranking technique has been found biased against older employees because older employees are disproportionately ranked lower while younger employees are disproportionately ranked higher.

20

68.     The 2019 SIRP termination decisions were not made by Plaintiffs' immediate superiors.

69.     Instead, the termination decisions were made by persons other than Plaintiffs' direct supervisors.

70.     Ford also evaluated Managers pursuant to the Company "Future Contribution Assessment" ("FCA").

71.     The FCA was carried out in secret and managers were often not informed of their FCA ranking.

72.     Older managers were disproportionately denied a high FCA score whereas younger managers and would routinely receive a disproportionately higher ranking.

73.     The Company used an evaluation tool known as "Key Talent."

74.     Managers who made the Key Talent list received promotional opportunities which were not available to Managers who did not make the Key Talent list.

75.     In order to be placed on the Key Talent list, a Manager must have enough work life left to secure two promotions.

76.     This means that older Managers who do not have as much work life left would never make the Key Talent list.

77.    This program was and remains infected with age bias because it favors younger Managers over older Managers.

78.    Prior to terminating Plaintiffs' employment under the SIRP, Ford knew or should have known that the SIRP/forced ranking program, the Key Talent and the FCA programs would result in the unlawful termination of older Managers and would interfere with their attainment of pension benefits previously conferred by Defendants through long-standing plan provisions and plan interpretations.

79.    Ford's knowledge of its illegal employment practices are based on (1) disparate impact analyses and estimates completed by Ford which, if properly performed and validated, showed or would have shown discrimination based on age; (2) Ford's prior experiences with the same or similar forced ranking and evaluation programs that have resulted in the termination of employees based on age; and (3) statistical and other analyses known to Ford showing that its forced ranking process discriminates against older employees based on age.

80.    In selecting Managers for the 2019 SIRP, Ford utilized the results of these programs contaminated by age bias resulting in older Managers disproportionately selected for termination in the 2019 SIRP.

**D.  Statement of Facts Regarding Werner Woellecke**

22

81.     Woellecke, born on February 25, 1969, was hired by Ford on January 2, 1992 as a salaried employee.

82.     Woellecke worked continuously for the Company until his involuntary separation occurring on May 31, 2019.

83.     At the time of his involuntary separation, Woellecke had 27.5 years of credited service with the Company and was 50 years old.

84.     At the time of his separation, Woellecke was classified as a LL5 and served as the Controller for the Company's Woodhaven Plant.

85.     Although Woellecke could not reach age 55 with the addition of three years of age, he was within 2.5 years of his 30-year milestone.

86.     Ford has regularly and repeatedly provided bridging benefits to employees such as Woellecke, and by operation of law, Wollecke had a right to bridging at the time of his selection for termination under the SIRP.

87.     Prior to his separation, Woellecke was recognized as a strong performer and contributor earning high praise from his superiors. He received regular promotions, merit increases, bonuses, and other financial rewards because of his outstanding performance.

88.     On May 21, 2019, Woellecke was informed of his separation by his superior Dave Parent ("Parent"), North America Controller for Manufacturing.

89.    On May 21, 2019, Woellecke requested from Parent that Ford bridge him to a 30-year service pension by adding to his service credits 2.5 years.

90.    Woellecke's request for Bridging was denied.

91.    Woellecke was offered severance on condition that he execute a release of claims against Ford.

92.    Neither Parent nor anyone else from the Company informed Woellecke of his right to participate the SRP as a Specified Employee or his right to place himself on the SRP Appendix A List for Special Select Benefits or to formally protest the decision to deny him participation rights in the SRP.

93.    If Defendants had not concealed from Woellecke the SRP and had it affirmatively informed him of his rights to pursue SRP bridging, his right to designate himself as a Specified Employee, his right to place himself on the SRP Appendix A List or his right to appeal the denial of his right to participate, Woellecke would have pursued those options and would not have signed the severance agreement offered at the time of termination.

94.    On May 23, 2013, Woellecke spoke with Fox and requested a transfer to Ohio to replace the controller at that location.

95.    Although both Parent and Fox supported the transfer, the request was denied by upper management.

96.     On May 31, 2019, Woellecke, without being informed of any of his rights under the SRP and his appeal rights under the SRP, executed and returned the Severance Agreement Release.

97.     Woellecke's execution of the release was not a knowing and voluntary waiver of his legal rights.

98.     On June 12, 2019, Woellecke further pursued his ERISA bridging rights under the SRP by sending an email to Parent and Fox:

> Hi Guys,
>
> Hope you guys are well.  Question for you either of you, I am hearing that a few of my peers that were separated were bridged to either age 55 or 30 years of service through a case review conducted by HR.  My situation at separation was as follows:
>
> Age 50
>
> Service 27 years and 5 months
>
> Request to be demoted to LL6 Controller was denied
>
> Are either of you familiar with this, and was I eligible for review and just not aware? I know both of you tried your best to keep me by sending me to Cleveland, and I appreciate that.  Would you support getting my case reviewed by HR to see if I could be bridged or pass along a contact, I can work with myself?  Let me know your thoughts.  Thank you
>
> > Regards,
> >
> > Werner Woellecke

99.     Human Resource responded on June 13, 2019:

> Thank you for your email and more importantly all your contributions to Ford. We realize the impact of the redesign of the business can be a very challenging experience, especially for those

leaving the Company. While Smart Redesign is an important step forward for Ford, unfortunately it has meant that we must let some Ford employees go, including employees who made valuable contributions to the Company over the years. Please know that we have been very thoughtful in structuring the Smart Redesign separation process to ensure we are treating employees fairly and consistently. The effective date for Wave 4 Smart Redesign Salaried Involuntary Reduction Process (SIRP) separations was established as 5/31/19 and your benefits eligibility is based off of that date. Ford is not in a position to reconsider or extend your separation date to bridge you to retirement eligibility, but it is offering a severance package under SIRP that we hope will help you during this transition, including competitive severance amounts, extended medical benefits, and career transition services through Right Management. Right Management has a high success rate of placement for individuals who elect to continue working, and we encourage you to begin engaging with them. Thank you again for all you have done while at Ford and know you will always be a part of the Ford family

100.   Woellecke was not informed of the existence of the SRP or any of his rights thereunder.

101.   Defendants did not inform Woellecke of his right to participate the SRP as a Specified Employee or his right to place himself on the SRP Appendix A List for Special Select Benefits or to formally protest or appeal the decision to deny him participation rights in the SRP.

102.   If Defendants had not concealed the SRP from Woellecke and had Defendants affirmatively informed him of his rights to pursue SRP bridging, his right to designate himself as a Specified Employee, his right to place himself on the SRP Appendix A List or his right to appeal the denial of his right to

participate, Woellecke would have pursued those options and would not have signed the severance agreement offered at the time of termination.

103.  On March 31, 2019, Woellecke, without being informed of his participation rights in the SRP and appeal rights under the SRP, executed and returned the Severance Agreement Release.

104.  If Defendants had informed Woellecke of his rights to pursue SRP bridging or to appeal the denial of his request/claim, then Woellecke would have pursued those options and would not have signed the severance agreement offered at the time of termination.

105.  Woellecke's execution of the release was not a knowing and voluntary waiver of his rights.

106.  The lump sum value of Woellecke's Ford pension with 27.5 years of service credits is $509,273.  If Ford had provided Woellecke with a bridge to a 30-year service credit the lump sum value of his Ford pension would be in excess of $1.2 million.

## F.  Statement of Facts Regarding Terry Haggerty

107.  Terry Haggerty ("Haggerty"), born on July 3, 1965, (54 years old) began his employment with Ford on October 7, 1991 (27.5 years).

108.  Haggerty worked continuously for Ford until March 31, 2019. As Chief Engineer in Product Development, at age 53, and at a LL 3 level, he was

selected for separation as part of the 2019 SIRP.

109.   Prior to his separation, Haggerty was recognized as a strong performer and contributor earning high praise from his superiors and regular promotions, merit increases, bonuses and other financial rewards due to his outstanding performance.

110.   Haggerty's lump sum pension, with 53 years of age and 27.5 years of service, was valued at $865,000. If allowed by the Company to work until September 1, 2020, at age 55, the lump sum value of his pension was $1.633 million.  If allowed by the Company to work until November 1, 2021 with 30 years of service, the lump sum value of the pension would be $1.890 million.

111.   On March 12, 2019, Haggerty was informed of his separation by Chuck Gray, Engineering Director, Electrical & Electronic Systems Engineering in Product Development.

112.   On March 21, 2019 Haggerty requested Bridging from Hau Thai-Tang, Executive Vice President of Product Development, Jim Holland, Vice President Engineering, Sara Orwig, Human Resources Senior Manager and Eric James, Human Resources Manager. Haggerty wrote:

I am still trying to get over my shock and amazement at being involuntarily separated from the company and am trying to decide how best to say my final words. I want to accomplish three things with this note, and I hope you'll take the time to read it.

First, I want to share with you how the involuntary separation has impacted me financially, especially given my age and years of service with the company. Second, I would like to request special consideration when it comes to the SIRP package I received. Lastly, I want to share with you a small snippet of the amazing feedback I've gotten from the hundreds of people who have reached out to me after hearing the news. I am pleased that my time at Ford Motor Company caused me to have a positive impact on other employees, including those I have mentored, and I wish that this could have continued.

I have 27.5 years of service and will turn 54 years old this year. Therefore, I'm not eligible for early retirement, and you are not offering a special early retirement option. Because I can't retire, I lose 50% of my pension lump sum, I lose all unvested RSUs, I have to cash in all vested RSU's within 3 months, I lose a company lease car for life, I lose SERP benefits, and I lose all retiree health care benefits. All of this equates to well over $1M in the near term and other significant losses that will accumulate over time, all because I am being forced to leave one year early. I still find it so hard to believe that for someone who has dedicated over 27 years servicing this company, and has worked in nearly every aspect of the Electrical Engineering organization, that you couldn't find a place in the new Smart Redesign VCSE organization for me.

With that said, I am asking for more compensation as I separate from Ford Motor Company, taking into consideration my lengthy years of service that far exceed the top range of years of service outlined in the present SIRP package. First priority would be to receive a credit for age or years-of-service making me eligible to apply for early retirement. Or, if the company is able to offer a special early option, that would work as well. If there's nothing that can be done regarding retirement eligibility, are you able to offer me incremental severance time or other lump sum payment when I exit? For those with 20 years of service, they are eligible for

9-months' severance, with nearly 28 years of service, can you offer me 18 months' severance or other comparable lump sum payment?

Lastly, I have been emotionally touched by the large number of people who have reached out to me, both verbally and in writing, to share their feelings about my separation. I know from self-reflection that I am not the most outspoken, well spoken, or "flashy" leader compared to many of my peers. And perhaps that's why I was not placed during the Smart Redesign. But, during the 27.5 years of my service and at management ranks from LL6 to LL3, I have had the opportunity to lead teams and have delivered significant and impactful results. I am a very strong leader and manager, as recognized by both my peers and subordinates. Please take the time to read these comments.

I look forward to your response. Please note I am prepared to sign the waiver as soon as I hear back from you.

Sincerely,
Terry Haggerty

113. On March 28, 2019 Haggerty's request for Bridging was denied.

114. Defendants did not inform Haggerty of his right to participate the SRP as a Specified Employee or his right to place himself on the SRP Appendix A List for Special Select Benefits or to formally protest the decision to deny him participation rights in the SRP.

115. If Defendants had not concealed the SRP from Haggerty and had Defendants affirmatively informed him of his rights to pursue SRP bridging, his right to designate himself as a Specified Employee, his right to place himself on the SRP Appendix A List or his right to appeal the denial of his right to

30

participate, Haggerty would have pursued those options and would not have signed the severance agreement offered at the time of termination.

116. On March 31, 2019, Haggerty, without being informed of his participation rights in the SRP and appeal rights under the SRP, executed and returned the Severance Agreement Release.

117. If Defendants had informed Haggerty of his rights to pursue SRP bridging or to appeal the denial of his request/claim, then Haggerty would have pursued those options and would not have signed the severance agreement offered at the time of termination.

118. Haggerty's execution of the release was not a knowing and voluntary waiver of his rights. Haggerty was not informed of the existence of the SRP or any of his rights thereunder.

## CLASS ACTION ALLEGATIONS

119. Plaintiffs request certification pursuant to Fed. R. P 23(b)(3) for arithmetically determined economic damages on behalf a class consisting of all former Ford Managers (LL1 through LL5) who are Michigan residents or subject to Michigan law hired before January 1, 2004, executed a release as part of the 2019 SIRP process and who were terminated within three years of attaining age 55 and who had at least 10 years of credited service and/or who were less than three years short of 30 years of Ford Service and who was not

informed of his or her Bridging rights regardless of the Class Member's retirement status.

120.   Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(2) on behalf of a proposed prospective injunctive relief class defined as Ford Managers who meet the definition of the class and who would benefit from an order of the court granting them the Bridging rights set forth in the SRP and other Ford ERISA Plan language consistent with these Bridging rights.

121.   Plaintiffs request issue certification pursuant to Fed. R. Civ. P 23 (c)(4) on behalf of Class Members who seek a class determination that Ford Managers meeting the class definition should have been granted Bridging to their Age or Service Milestone.

122.   The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for injuries sustained and to obtain class wide prospective equitable injunctive relief.

123.   There are questions of law and fact raised by the named Plaintiffs' claims common to those raised by the Class(es) they seek to represent. Such common questions predominate over question affecting only individual members of the Class(es). The violations of law and resulting harms alleged

by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

124.   Class representatives will vigorously prosecute the suit on behalf of the Class; and the Class representatives are represented by experienced counsel. Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation involving employment law issues.

125.   There is no conflict between Class Representatives because for purposes of this lawsuit, higher level Managers did not decide which lower level Managers were selected for the SIRP and higher level managers did not communicate with lower level Managers information about the existence of the SRP or the Bridging benefits which were available through the SRP.

126.   Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class.

127.   The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice.

128. The prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or one or more of the Defendants.

129. Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating declaratory and injunctive relief for the Class.

130. A class wide prospective equitable remedy is appropriate here. This prospective remedy should consist of a court order voiding the releases because they were obtained by fraudulent concealment and the issuance of an order directing the Company to enforce the terms of the Plan, as reformed, and to award each Class Member a 3+3 Bridge benefit as provided for in the SRP.

## COUNT I

### DECLARATORY JUDGMENT THAT THIS COURT HAS JURISDICTION OVER THE CLAIMS ASSERTED IN THIS FIRST AMENDED COMPLAINT.

131. Plaintiffs incorporate by reference all the allegations contained above.

132. Ford has asserted in response to Plaintiffs' First Amended Complaint that the Court should compel arbitration of the issues in this case, and Defendants will presumably assert the same in response to this Second Amended Complaint.

133.  The arbitration provision contained in the waiver executed by Plaintiffs was obtained by fraudulent concealment.

134.  The arbitration provision has an express exclusion for claims for ERISA benefits and an express exclusion for claims for injunctive relief.

135.  The General Release, in Paragraph 12(c) provides that the Court, not an arbitrator, is to determine whether the class action waiver is "unenforceable, unconscionable, void or voidable[.]"

136.  Plaintiffs are pursuing a claim for ERISA Bridging benefits and they are pursuing prospective injunctive relief both individually and on behalf of a class of similarly situated persons, which relief is designed to:  (1) enjoin Defendants from violating ERISA in the manners alleged; (2) direct Ford to reform the applicable ERISA plan(s) to remove amendments that are void as violative of ERISA; (3) direct Defendants to enforce the lawful terms of the Plan(s), as reformed; and (4) directing Defendants to provide Plaintiffs with Bridging to age and service Milestones, under the lawful terms of the ERISA plans, as reformed.

Accordingly, Plaintiffs request a Declaratory Judgment that they are not required to arbitrate the excluded claims for ERISA benefits and their requests for prospective injunctive relief and that they can pursue their claims as class claims; a declaratory judgment that the general release is unenforceable,

unconscionable, and void or voidable; and a Declaratory Judgment that the lawsuit may proceed as a putative class action.

## COUNT II

### RESCISSION AND RELEASE BASED ON VIOLATION OF OWBPA, SILENT FRAUD, AFFIRMATIVE MISREPRESENTATION, DURESS, AND/OR UNCONSCIONABILITY

137. Plaintiffs incorporate the above allegations as if stated in full herein.

138. The release of claims, arbitration agreement, and class action waiver executed by Woellecke and Haggerty were not knowingly and voluntarily given because Defendants concealed from them the existence of the SRP and the opportunity for an SRP Bridging benefit.

139. ERISA requires that participants in ERISA-governed plans provide an Summary Plan Description (SPD) or Summary of Material Modifications (SMM) relating to the Bridging benefits and participation rights and/or the appeal rights if a claim for benefits is denied.

140. Under such circumstances, the concealment of the true facts known to Defendants and the deliberate creation of false impressions and inferences is the equivalent of an express and intentional misrepresentation.

141. Because, at the time of the misrepresentations and concealment, Woellecke and Haggerty were (and still are) ERISA participants and

beneficiaries under the GRP and the SIRP and were participants under the SRP, Defendants had a fiduciary relationship with them which required Defendants to provide material information about Bridging benefits and about the SRP itself.

142.   Defendants knew or should have known that the failure to provide the information would be harmful to Woellecke and Haggerty's financial interests.

143.   In violation of their ERISA fiduciary duties, Defendants failed to provide material information about Bridging benefits in order to induce them into signing waivers and releases that were fraudulently procured and that were procured under duress.

144.   The General Release is invalid under the Older Workers Benefit Protection Act (OWBPA) because:  (1) it was induced by fraud, duress, undue influence, or other improper conduct by the employer, as alleged in this complaint; (2) the employees against whom Defendants seek to enforce the waiver had no input in negotiating the terms of the agreement; (3) the waiver had the effect of misleading, misinforming, or failing to inform the employees of advantages and disadvantages of agreement, including concealment of bridging rights; (4) Defendants failed to provide enough information about the factors it used in making selections to allow employees who were laid off to

determine whether older employees were terminated while younger ones were retained; and (5) Defendants' disclosures of separated and non-separated employees in Plaintiffs' decisional units did not provide sufficient information regarding the selection factors, and in fact were misleading, because Defendants "sprinkled" the decisional units with older employees to disguise the effect of age bias in the selection process.

145.   The General Release required of Plaintiffs as a condition precedent or eligibility requirement in order to obtain enhanced SIRP benefits is unconscionable on its face, including without limitation:

a.   Plaintiffs and other employees had no meaningful opportunity to negotiate the terms and language of the release, as the agreement was "not negotiable." (Release, Para. 11);

b.   The release purports to waive class actions as to both Plaintiffs and Ford, which is illusory and misleading (Release para. 12);

c.   The release requires Plaintiffs to acknowledge that Ford has allowed them 45 days to consider the proposal, and the Plaintiff is required to waive the 45-day period if they accept in less time.  This waiver is not set forth in a separate document, as required by the ADEA (Release, Para. 14).

d.   The release purports to waive claims for benefits under any benefit

plan, except for claims that have already been filed, but there is no

basis for any individual Plaintiff to know whether claims affecting

their rights have been filed, and therefore no basis for a knowing

and voluntary waiver of such rights or claims (Release, Para. 3).

e.     The agreement requires Plaintiffs to acknowledge that they may

have been offered, and rejected, a termination incentive program

in the past that may have provided better benefits."  Because the

language of the release was non-negotiable, the plaintiffs could not

accurately state or acknowledge that they had never been offered

a prior program. Nor could plaintiffs assert that they were offered

previous benefits would have been better than SIRP benefits

(Release, Para. 4).

f.     The agreement requires Plaintiffs to represent they had not

sustained any workplace injuries, resulting in an effective

prospective waiver of workers' compensation rights, or to permit

the Company to impeach the plaintiff in a later workers

compensation proceeding, and does not permit Plaintiffs to state

they had sustained work-related injuries (Release, Para. 2).

g.     The agreement requires Plaintiffs to state they are not aware of any

violation or non-compliance with law, even if they were so aware

(Release, Para. 2).

h.   The agreement states falsely that the Company has relied on Plaintiffs' representations in the Release "in determining the amount of the benefits described herein" even though Defendants had already determined the amount of severance benefits offered, and there was no mutuality of obligation or reliance.

i.   The release requires Plaintiffs to agree they "will not accept" any monetary damages and any other form of relief obtained by the EEOC or other government agency enforcing discrimination laws.

j.   The release was obtained through fraud, misrepresentation, and concealment, as detailed in this Complaint.

146.   Defendants also made material misrepresentations when they rejected Plaintiffs' requests for a Bridging Benefit and failed to disclose to them the existence of the SRP and the availability of participation and appeal rights.

147.   Woellecke and Haggerty detrimentally relied on Defendants' false representations that no right to a Bridging benefit existed.

148.   If Woellecke and Haggerty had been fairly and properly informed of the existence of the SIRP or their right to participate or make a formal complaint to pursue appeal rights if their claim was denied, they would not have executed the Release of claims.

40

149.   The release does not preclude judicial review because The General Release, in Paragraph 12(c) provides that the Court, not an arbitrator, is to determine whether the class action waiver is "unenforceable, unconscionable, void or voidable[.]"

150.   Plaintiffs are not required to tender back their severance benefits at the outset of this litigation, where in *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 426 (1998), the Supreme Court "disavowed the tender-back rule in the context of remedial employment statutes." *McClellan v. Midwest Machining, Inc.*, 900 F.3d 297, 304 (6th Cir. 2018), cert. denied, 139 S. Ct. 2691, 204 L. Ed. 2d 1090 (2019).

151.   The Sixth Circuit has thus held, post-*Oubre*, that the tender-back doctrine is inapplicable to ERISA and ADEA claims.  "[I]n equity 'a person suing to rescind a contract, as a rule, is not required to restore the consideration at the very outset of the litigation.'" *McClellan*, 900 F.3d at 305 (6th Cir. 2018), cert. denied, 139 S. Ct. 2691, 204 L. Ed. 2d 1090 (2019)(quoting *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 426 (1998).  And, "applying the tender-back doctrine to ADEA lawsuits 'would frustrate the statute's practical operation....'" *Id.* (quoting *Oubre*, 522 U.S. at 427).

152.   Furthermore, "ERISA, like the ADEA and the FELA, is a 'federal remedial statute.' It was 'designed to promote the interests of employees and

their beneficiaries in employee benefit plans.'" *McClellan*, 900 F.3d at 306 (6th

Cir. 2018) (quoting *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 784 (3d

Cir.2007).("Additionally, as the Court explained in *Oubre* the application of the

doctrine of ratification to ERISA claims may frustrate the practical operation of

the protections ERISA affords. It is likely that many employees discharged in

violation of § 510 may have spent the moneys they received as severance pay.

Employers could risk noncompliance with the requirement that a release must

be made knowingly and voluntarily and simply rely on ratification.").

Accordingly, Plaintiffs request an order declaring that the releases of

claims executed by Plaintiffs and the putative class members are void and not

enforceable in this action; an order declaring that Plaintiffs are not required to

tender back severance benefits to pursue their claims; a declaratory judgment

that the general release is unenforceable, unconscionable, and void or voidable;

a Declaratory Judgment that the class action waiver is unenforceable, and a

Declaratory Judgment that the lawsuit may proceed as a putative class action.

## COUNT III

### VIOLATION OF THE INTERFERENCE PROVISIONS OF ERISA §510

153.  Plaintiffs incorporate by reference all the allegations contained

above.

154.  Section 510 of ERISA, 29 U.S.C. §1140, makes it unlawful "[f]or any person to discharge, fine, suspend, expel, discipline or discriminate a participant or beneficiary... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, [or] this title." 29 U.S.C. §1140.

155.  Each of the Defendants is a "person" within the meaning of ERISA §510.

156.  The prohibitions of § 510 are aimed primarily at preventing employers from discharging or harassing their employees in order to interfere with their attainment of future employee welfare benefits and employee pension rights, whether vested or unvested.

157.  By its terms, ERISA §510 protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting. However, the protections of ERISA §510 are not limited to vested pension rights. The Sixth Circuit has clarified that ERISA §510 prohibits interference with rights to which an employee 'may become entitled' under 'an employee benefit plan' and does not limit its application to benefits that will become vested.

158.  Unlawful interference under ERISA §510 includes terminating an employee in order to interfere with the employee's ability to receive future

43

benefits or rights under an ERISA plan. ERISA §510 was designed to protect the employment relationship which gives rise to an individual's pension rights.

159.  In this case, Ford intentionally terminated Plaintiffs' employment pursuant to the SIRP with the specific intent to interfere with Plaintiffs' ability to receive identifiable ERISA Plan benefits, specifically (1) "55 and 10" early retirement benefits under the GRP; (2) "30 and Out" supplemental benefits" under the GRP; and (3) "3+3 Bridge" benefits under the SRP.

160.  In selecting employees for termination under the SIRP, Defendants utilized an algorithm constructed to target employees for termination based on proximity to age or service Milestones.

161.  There is evidence that Ford and its Senior Management (some of whom served as plan administrators of the Company's ERISA-governed plans, including without limitation those plans at issue here) and the remaining Defendants were concerned about high GRP legacy costs attributable to older employees, such as Plaintiffs, who were close to attaining full GRP benefits in the form of "55 and 10" or 30-year retirement benefits. Internally, Ford and its Senior Management expressed concerns about increasing pension liabilities in the form of pension benefits that would be payable to aging management level employees who were approaching but still short of their "55 and 10" early retirement benefits and "30 and out" supplemental pension benefits.

162. Ford Senior management expressed the intention and gave directives to terminate employees in the SIRP process if they were hired before January 2004, because they participated in the GRP and would become eligible for additional GRP benefits if their employment continued. Ford's intention to terminate Plaintiffs and others based on their eligibility for additional GRP benefits is further demonstrated by the fact that Plaintiffs and other similarly-situated employees were terminated and purportedly replaced by older retirement-eligible employees, who were selected by Ford in order to "sprinkle" the SIRP decisional units for the purpose of making it appear that the separation process was not infected with age bias.

163. In fact, the older employees who were retained had already reached their age and/or years of service Milestones under the GRP, and Defendants therefore achieved the goal of discriminating against Plaintiffs and others who would become eligible for additional GRP benefits, while at the same time making it appear that Defendants did not discriminate against Plaintiffs based on age or benefit rights.

164. This aspect of the Smart Redesign and SIRP termination process violated the ADEA, which prohibits discrimination based on age, and the ELCRA, which prohibits discrimination based on age, regardless of whether the plaintiff-employee is younger or older than the similarly situated employees

45

who were not selected for termination.

165.   When Plaintiffs and other employees inquired about the availability of Bridging rights, Defendants deliberately concealed their rights under the SRP, which would have afforded them "3+3 Bridging" to preserve their full GRP early retirement and supplemental pension benefits.

166.   These acts of concealment were carried out in conjunction with the SIRP as part of the formal process for terminating Plaintiffs' employment under the SIRP.

167.   Ford's intention to interfere with the Plaintiff's GRP and SRP benefits was a determining factor in its decision to terminate Plaintiffs' employment in the SIRP.

168.   Plaintiffs were all approaching vesting in full GRP benefits, and this proximity to vesting provides an inference of intentional, prohibited interference in violation of § 510.

169.   Plaintiffs have standing to bring their § 510 claims against Ford because they are employees or former employees of Ford, they are participants in and beneficiaries of the SIRP and the GRP, they were participants in the SRP, and  they were, are or may become eligible to receive a benefit from SRP through the equitable and injunctive remedies entered by this Court.

170.   Furthermore, In violation of ERISA §510, Woellecke's termination

interfered with his benefit under the Rule of 85 (described below), limited him to the shorter Freeze Date (which cut off the amount of extra credited service to that which would be credited at December 31, 2019), and imposed a minimum age requirement of 55 on the 30 and Out benefit.

171. As a result of Ford's violation of § 510 of ERISA, 29 U.S.C. §1140, Plaintiffs have suffered and will continue to suffer damages in the form of lost salary and benefits, including GRP and SRP benefits.

172. Accordingly, to redress the violations of §510 alleged in this action, Plaintiffs request the following relief from this Court:

      a.   A declaration that Ford violated Plaintiffs' rights under §510 of ERISA when it terminated their employment in order to interfere with their ability to receive future benefits under the GRP and the SRP;

      b.   A declaration that Ford violated Plaintiffs' rights under §510 of ERISA when it terminated their employment and concealed their rights to "3+3 Bridging" under the SRP;

      c.   A declaration that Plaintiffs are not required to tender back their severance benefits as well as an injunctive barring Ford from seeking the return of severance benefits.

      d.   An equitable order of reinstatement to their prior positions or to comparable positions of employment with Ford, or an equitable order of front pay in lieu of reinstatement;

      e.   Prospective injunctive relief directing Ford to reform the SIRP, the SRP, and the GRP to provide Plaintiff with bridging benefits;

f. An order of any other equitable and/or legal relief the court deems necessary to enforce Plaintiffs' rights under ERISA, including but not limited to an order requiring Ford to provide Plaintiffs "3+3 Bridging" under the SRP; and

g. An award of attorneys' fees and costs.

## COUNT IV

### VIOLATION OF ERISA §204(g)
### ELIMINATION OF PROTECTED BENEFIT

173. Plaintiffs incorporate by reference all the allegations set forth above.

174. ERISA Section 204(g) provides in pertinent part: "The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8)…of this title…" *Id.*

175. This section of ERISA is known as "The Anti-Cutback Rule."

176. The Anti-Cutback Rule applies to subsidized early retirement benefits, such as the "30 and out" and "55 and 10" benefits under the GRP, if the participant satisfies the conditions for the subsidy "either before or after the amendment" that eliminates or reduces the subsidy. ERISA §204(g)(2), 29 U.S.C. §1054(g)(2).

177. The Select Retirement Plan (SRP) relates to the Ford GRP and, taken together, both Plans allow an employee to receive an early retirement

subsidy (55 and 10 or 30 and out) under the GRP after adding three years to the employees' attained age and service required for determining eligibility for those benefits.

178.  On information and belief, the plans define "Accrued Benefit" to include non-forfeitable benefits for participants who have vested by virtue of credited service as ERISA defines credit service for single-employer pension benefit plans.

179.  Treasury Regulations provide that when "an employer establishes a repeated pattern of repeated plan amendments providing for similar benefits in similar situations for substantially consecutive, limited periods of time, such benefits will be treated as provided under the terms of the plan, without regard to the limited periods of time." Treas.Reg. §1.411(d)-4, Q&A-1(c)(1).

180.  Ford established such a pattern of repeated plan amendments that are deemed a term of its GRP and SRP by regularly and repeatedly providing SRP bridging benefits, or bridging benefits similar to the SRP, prior to the execution of involuntary reduction programs such as the 2019 SIRP.

181.  Specifically, Ford has regularly and repeatedly provided bridging to GRP participants prior to involuntary termination programs similar to the 2019 SIRP so that GRP participants who were hired by Ford prior to January 1, 2004, such as Plaintiffs, could bridge to milestones for early retirement

subsidies (55 and 10 and/or 30 and out) before termination.

182.   Pursuant to Treas.Reg. §1.411(d)-4, Q&A-1(c)(1), bridging rights to early retirement benefits for GRP and SRP participants prior to or in conjunction with involuntary termination programs became a term of the GRP and SRP that could not be cut back by subsequent amendment or interpretation by Defendants, including Ford.

183.   By operation of law as to the qualified plans at issue in this lawsuit, including the SIRP, Plaintiffs had a right to bridging under the GRP and SRP at the time they were informed of their involuntary terminations under the 2019 SIRP.

184.   In this case, Plaintiffs satisfied the conditions for GRP Select Benefits under the SRP, to bridge them to Milestones for early retirement subsidies (55 and 10 and/or 30 and out) before termination.

185.   Ford violated § 204(g) of ERISA when it amended the SRP effective January 1, 2018 to decrease the accrued GRP select benefits (ie, bridging rights) of participants through the following amendments to the SRP:  (1) amending the plan to include Section 2.18, which provides a "Freeze Date," defined to mean the later of December 1, 2019, or the end of the month during which the Eligible Executive reaches 35 years of Credited Service[;]"    (2) amending Section 2.07 to change the definition of contributory service to stop as of the

"Freeze Date;" and (3) amending Section 2.08 to change the definition of credited service to stop as of the "Freeze Date;" and (4) deleting entirely the discretion afforded in the predecessor SRP to a high-level executive to lower the minimum age requirement for early retirement benefits (other than "30 and Out" benefits which had no such minimum age requirement) to 52 – a deletion that operated in conjunction with the involuntary termination of plaintiffs on March 31 and May 31, 2019 (i.e., before the end of June 2019) and in conjunction with the new Freeze Date to cut off plan participants vested under the predecessor plans for GRP Select Benefits from early retirement benefits under "30 and Out" or the "Rule of 85."

186.   These amendments decreased and effectively eliminated Plaintiffs' accrued rights to GRP Select Benefits (bridging) and GRP early retirement subsidies  (55 and 10 and/or 30 and out) because they eliminated the "3 plus 3" bridging rights and provided that participants would only be bridged to early retirement subsidies if they could meet their GRP milestones before December 31, 2019.

187.  Thus, the amendments eliminated the employees' benefit of meeting eligibility for those GRP early retirement subsidies "after adding three years to such employees' attained age and service[,]" and replaced that benefit with a drastically reduced benefit of meeting eligibility for early retirement

prior to December 31, 2019.

188.   Ford amended the SRP with the specific intent of "freezing out" employees who would need a "3 plus 3" bridge to reach their early retirement Milestones past December 31, 2019, thus decreasing and/or eliminating their accrued bridging and GRP early retirement subsidies.

189.   In other words, Ford amended the SRP to provide that employees could receive a "3 plus 3" bridge, but only if the bridge would allow them to reach their pension Milestone before December 31, 2019.

190.   Because the date of the effective amendment was January 1, 2019, the amendment and imposition of the "Freeze Date" eliminated a true "3 plus 3" bridging benefit entirely.

191.   Ford amended the SRP, and tailored the amendments to eliminate bridging rights, with knowledge that it would be implementing phased retirement and involuntary termination programs, including the SRP, and for the purpose of achieving its primary objective of pension benefit avoidance when it terminated older employees who were approaching their retirement milestones.

192.   Predecessor versions of the SRP, in defining GRP Select Benefits, provided a formula taking GRP benefits into account in order to calculate the GRP Select (Bridging) Benefit.

193.   Under the formula, 3 years for age is added onto the attained age when the employee experiences the Retirement Effective Date.

194.   The years of service can continue to accrue for the non-contributory plan (the old Defined Benefits part of the GRP) for 3 years after the Retirement Effective Date.

195.   The amended SRP Freeze Date cuts that benefit accrual back with a hard stop at the later of December 31, 2019, or 35 years of "credited service."

196.   The Freeze Date cuts off the benefit by curtailing credit for years of service as of that date, rather than the 3 years of credited service previously allowed to be accrued after the Retirement Effective Date.

197.   The Early Retirement Component of the GRP has a Rule of 85, under which an early retiree receives enhanced benefits (100 percent/no reduction for persons between age 62 and 65).

198.   There is also no minimum age requirement for the 30 and Out early retirement supplemental benefit in the GRP SPD.

199.   The Rule of 85 means one can be age 50 with 35 years of service, or 51 with 34 years of credited service, or 52 with 33 years of service, and so on.

200.  Defendants, in designing the most recent versions of the SRP and GRP, invented a new definition for "Credited Service" that differs from "ERISA Service" - a new phrase in the GRP Summary Plan Description, to avoid the effect of the GRP Rule of 85.

201.  Imposing a new eligibility requirement to the 30 and Out after a participant has completed 5 years of service and a new separation date term (immediate break in service and no credited service thereafter) and/or the Freeze Date, cuts off the amount of credited service to service attributed through December 31, 2019 (and not added all at once at Retirement Effective Date).

202.  Plaintiff Haggerty, age 53 at the separation date, did not receive 3 years of enhanced age over attained age so that he  would be deemed 56 at Retirement Effective Date because the 3 years is added to the employee's age at the Retirement Effective Date; such an employee would need only 29 years of credited service to qualify for "Regular Early Retirement."

203.  Haggerty was terminated 3 months before he would have obtained 28 years of service, as explained in the next paragraph.

204.  Under the former plan, Haggerty's 3 years of additional credited service would have been credited as of his Retirement Effective Date under the predecessor SRP.

54

205.   The predecessor Ford Retirement Plan and the GRP also allowed adding the 3 years of service as of the Retirement Effect Date.

206.   The SIRP amended the GRP and SRP by not awarding the 3 years of credited service as of the Retirement Effective Date, i.e., March 31, 2019 for Haggerty and May 31, 2019 for Woellecke.

207.   In addition, Haggerty, terminated in March 2019, was terminated 3 months before he would have attained his 28 years of credited service.

208.   Ford terminated Haggerty before his birthday on July 3 and denied him the 3-year age bridge, thus preventing him from being deemed age 57 for benefits purposes as of May 31, 2019.

209.   Terminating Haggerty before June of 2019 prevented him from achieving 28 years of credited service (even without adding 3 years of credited service), and he would have been entitled to the Rule of 85 Early Retirement Benefit, even under the earlier Freeze Date.

210.   Woellecke was 50 when he was separated on May 31, 2019, one month before he could earn his 28th year of credited service.

211.   Giving Woellecke the 3 extra years of credited service would not get him to the Rule of 85 (he would be at 54) as of the Retirement Effective Date.

212.   Plaintiff Haggerty's situation illustrates how Ford's cutback and termination program was designed to harm the participants whom ERISA is

55

meant to protect.

213.   At the time of his termination on March 31, 2019, Haggerty was 53 years, 8 months old, and had 27.5 years of contributory and credited service.

214.    As an LL3 employee, Haggerty was a participant in the SRP with accrued bridging rights.

215.   Ford never provided notice that the plan had been amended to freeze bridging benefits at the "Freeze Date" of December 31, 2019.

216.   Ford never provided a summary plan description (SPD) or summary of material modifications (SMM) for the Select Retirement Plan.

217.   Ford employees such as Plaintiffs were unaware of the terms of the SRP and were therefore unable to pursue claims for benefits or appeals on the administrative level regarding their Select Benefits.

218.   If Haggerty had received a "3 plus 3" bridge as provided in the plan (absent the Freeze Date) he would have reached the milestones for both the "55 and 10" and "30 and out" early retirement subsidies under the GRP.

219.   Plaintiffs are thus deprived of the unreduced Early Retirement Benefit at 62 (100% of the age 65 benefit) and the retirement supplement allowance under the GRP.

220.   As a result of the cutback, Woellecke is limited to the credited service he had as of the Freeze Date of December 31, 2019.

221.   Furthermore, the SRP purports to give Ford the discretion, as the employer, to select which employees will be eligible participants for bridging rights under the SRP.

222.   Such retention of discretion by the employer to deny an employee the right to a protected benefit is the functional equivalent of amending the plan to eliminate such a benefit because, if discretion is withheld, the benefit will not be available.  Treas. Reg. §1.411(d)-4, Q&A 4.

223.   Such discretion is not permissible unless it is merely used to apply objective criteria set forth in the plan.  *Id.*

224.   Here, the SRP does not set forth objective criteria for selecting which employees will be eligible for select benefits, specifically, bridging rights.

225.   As a result, Ford has violated ERISA by selecting employees for bridging rights without objective criteria, effectively eliminating bridging benefits for employees whom it does not select for bridging.

226.   Indeed, in this case, Ford told higher level management employees at Levels LL1, LL2, and LL3 that involuntary reductions were coming and that they had an opportunity to bridge.

227.   By contrast, when the Plaintiffs and similarly situated employees at the levels of LL4, LL5, and LL6 inquired about bridging, Ford concealed and misrepresented their bridging rights and told them Ford could not bridge them

to critical retirement milestones.

228.  In fact, because Plaintiffs had a vested right to bridging, Ford had no right to offer them a lesser bridging benefit that the benefit to which they were lawfully entitled under the plan.

229.  Ford violated Section 204(g) when it decreased the Plaintiffs' accrued benefits by amending the SRP without obtaining appropriate approval for such an amendment in violation of Section 204(g) of ERISA, 29 U.S.C. §1054(g).

230.  Specifically, Ford decreased Plaintiffs' accrued benefits by amending the SRP to provide that employees would only be eligible for bridging if they had reached 35 years of service, or if they would reach their retirement milestone by December 31, 2019, absent bridging.

231.  These amendments decreased and effectively ceased the accrued bridging benefits for Plaintiffs and other similarly situated Plaintiffs, and they were consistent with Ford's specific intent to avoid providing accrued benefits by firing Plaintiffs and other similarly-situated employees at a critical point in time when they could not possibly qualify for the new criteria for bridging rights set forth under the SRP, as amended.

232.  There is direct evidence of a prohibited cutback in this case because:

a. The GRP provides for an early retirement supplement "30 and out" for employees who reach 30 years of credited service, regardless of age;

b. The SRP provides that an employee is only eligible for GRP Select Benefits (bridging benefits) if their attained service time, after adding three years, allows them to meet the eligibility requirement, and if the employee "is at least age 55, taking into consideration the three additional years of age provided under this Plan, as of the Retirement Effective Date[.] (SRP as of 1/1/18, Sec. 2.21, defining "Eligible Executive(s)").

c. This language effectively amends the GRP by grafting on the age 55 requirement for obtaining 30 and out benefits, i.e., providing that in order to receive "30 and out" benefits, the employee must reach 30 years and be at least 55 years old.

d. This amendment reduces the accrual of 30 and out benefits for Plaintiffs and is a prohibited cutback under §204(h) and is therefore void.

e. For some Plaintiffs and similarly-situated employees, Ford told them they might be approved for bridging if their

milestone, absent bridging, could be reached before December 31, 2019, when in fact, the Plaintiffs had a vested right to bridging regardless of whether their milestone would be reached before that date.

f. Ford has directly admitted the facts constituting a cutback. In its Answer to the Plaintiff's Amended Complaint in *Dowhan et al v Ford Motor Company*, No. 19-cv-11923, Ford admitted: "...for employees selected to be involuntarily terminated through SIRP as a result of the Smart Redesign process, if such an employee had not yet reached any GRP retirement milestone and, but for their selection for separation, would have reached either of the age and service milestones for certain GRP benefits by or before December 31, 2019, Ford permitted such an employee to remain an active employee until the first date on which the employee met one of the GRP retirement milestones, but no later than December 31, 2019." (Case No. 19-11923, DE 19, ¶12, Page ID 161-62).

233.   A provision of a pension plan that is inconsistent with ERISA is void as a matter of law. ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D).

234.   The SRP amendments effective January 1, 2018 are void for the reasons set forth above.

235.   Accordingly, Plaintiffs seek:

a.   An order declaring that Ford violated ERISA Section 204(g) in the specific manner alleged above;

b.   An order declaring that the amendments to the SPR, effective January 1, 2018, are void as a matter of law because they were not properly disclosed to employees and they violated ERISA in the manner alleged above;

c.   An order enjoining Ford from continuing to violate the law and the terms of the Plans in the manner alleged or referenced in this Complaint;

d.   An order of injunctive relief reforming the Plans and compelling Ford to bring the terms of and administration of the Plans into compliance with ERISA or the lawful provisions of the Plans;

e.   An equitable injunctive order requiring their SRP benefits be immediately vested.

f.   An equitable injunctive order requiring their full GRP early retirement (30 and out and 55 and 10) benefits be immediately vested.

g.   An order awarding pre and post-judgment interest;

h.   An order awarding Plaintiff's attorney's fees along with reimbursement of expenses incurred in connection with this action;

i.   An order awarding, declaring, or otherwise providing all other

equitable relief the Court deems appropriate under ERISA §502(a).

## COUNT V

### VIOLATION OF ERISA §204(H)
### FAILURE TO PROVIDE NOTICE

236. Plaintiffs incorporate by reference all the allegations set forth above.

237. In ERISA Congress imposed special notice requirements with respect to any plan amendment that works "a significant reduction in the rate of future benefit accrual." IRC §490F; ERISA §204(h).

238. A reduction in an early retirement benefit or a retirement-type subsidy is treated as a reduction in the rate of future benefit accrual.

239. Section 204(h) forbids secret amendments through which an employee could have the value of his or her benefits reduced by a prospective amendment to the accrual provisions of a pension plan.

240. Through section 204(h), Congress ensured that if a plan sponsor were to amend the plan prospectively, the plan administrator must inform employees and their representatives of those changed circumstances.

241. Section 204(h) notice must be furnished to participants within a reasonable time before he effective date of the amendment, which has been interpreted in the regulations generally to mean a minimum of 45 days. See

Treas.Reg. §54.4980F-1, Q&A-9.

242.   Plan administrators are required to provide the notice "in a manner calculated to be understood by the average plan participant" and must provide sufficient information to allow participants to understand the effect of the amendment.  ERISA §204(h)(2).

243.  Thus, the notice "must include sufficient information for each [individual] to determine the approximate magnitude of the expected reduction for that individual."  Treas.Reg. §54-4980F-1, Q&A-11(a)(4).

244.   In this case, it is evident that Ford amended the SRP to reduce bridging rights and that Ford considered such amendments for some time prior to the actual amendment and prior to informing Plaintiffs of their selection for termination in the SIRP.

245.   In violation of its duty under Section 204(h), Ford failed to provide participants notice of the amendment to the SRP to reduce Plaintiffs' vested bridging rights, and thus their rights to defined early retirement benefits under the GRP.

246.  ERISA requires that employers such as Ford must provide employees with an accurate and complete summary plan description (SPD).

247.  Ford failed to provide plaintiffs and other participants summary plan descriptions (SPD) for the SRP, much less an accurate and complete SPD

that discloses the material provisions of the plan.

248.   Furthermore, a benefit-reducing amendment that was not properly disclosed is void as a matter of law, and thus the amendments of the SRP, effective January 1, 2018, are void as a matter of law.

249. Ford's failure to comply with the notice requirement was "egregious" for purposes of ERISA in that the failure to give notice was intentional.  ERISA §204(h)(6)(B); Treas.Reg. §54-4980F-1, Q&A-14(a)(2).

250. In the alternative, Ford's failure to comply with the notice requirement was "egregious" for purposes of ERISA in that the failure to give notice was unintentional and it failed to provide most of the individuals with most of the information they were entitled to receive. *Id*.

251.   Because Ford's failure to comply with the notice requirement was "egregious," Plaintiffs and all similarly situated participants are entitled to the greater of their pre-amendment benefits or their benefits under the amendment, as equitable relief.  ERISA §204(h)(6)(B).

Accordingly, Plaintiffs seek:

a. An order declaring that Ford violated ERISA in the specific manner alleged above;

b. An order declaring that the amendments to the SPR, effective January 1, 2018, are void as a matter of law because they were not properly disclosed to employees and they violated ERISA in the manner alleged above;

c.  An order enjoining Ford from continuing to violate the law and the terms of the Plans in the manner alleged or referenced in this Complaint;

d.  An order of injunctive relief reforming the Plans and compelling Ford to bring the terms of and administration of the Plans into compliance with ERISA or the lawful provisions of the Plans;

e.  An equitable injunctive order requiring their SRP benefits be immediately vested;

f.  An equitable injunctive order requiring their full GRP early retirement (30 and out and 55 and 10) benefits be immediately vested;

g.  An order directing Ford to provide Plaintiffs the greater of their pre-amendment benefits or their benefits under the amendment, as equitable relief;

h.  An order awarding pre- and post-judgment interest;

i.  An order awarding Plaintiff's attorney's fees along with reimbursement of expenses incurred in connection with this action;

j.  An order awarding, declaring, or otherwise providing all other equitable relief the Court deems appropriate under ERISA §502(a).

## COUNT VI

## VIOLATION OF ERISA
## PARTIAL TERMINATION OF BENEFIT PLAN

252.  Plaintiffs incorporate by reference all the foregoing allegations.

253.   Under ERISA, a partial termination of a benefit plan will be deemed to occur if a defined benefit plan ceases or decreases "future benefit accruals." Treas.Reg. §1.411(d)-2(b)(2).

254.   As set forth above, Ford ceased and decreased future benefit accruals by reducing or eliminating Plaintiff's GRP Special Benefits, thereby reducing or eliminating Plaintiff's bridging benefit and early retirement subsidies.

255.   As a result of the ceasing or decreasing of future benefit accruals, Ford created a potential reversion to itself as the employer.

256.   This form of partial termination is known as a horizontal partial termination.

257.   This horizontal partial termination entails a cutback in future benefits for employees who continue to participate in the plan.

258.   The effect of a horizontal termination is to vest those whose future benefits are cut back.

Accordingly, Plaintiffs seek:

a. An order declaring that Ford violated ERISA in the specific manner alleged above;

b. An order declaring that the amendments to the SPR, effective January 1, 2018, are void as a matter of law because they were not properly disclosed to employees and they violated ERISA in the manner alleged above;

66

c.  An order enjoining Ford from continuing to violate the law and the terms of the Plans in the manner alleged or referenced in this Complaint;

d.  An order of injunctive relief reforming the Plans and compelling Ford to bring the terms of and administration of the Plans into compliance with ERISA or the lawful provisions of the Plans;

e.  An equitable injunctive order requiring their SRP benefits be immediately vested;

f.  An equitable injunctive order requiring their full GRP early retirement (30 and out and 55 and 10) benefits be immediately vested;

g.  An order awarding pre and post-judgment interest;

h.  An order awarding Plaintiff's attorney's fees along with reimbursement of expenses incurred in connection with this action;

i.  An order awarding, declaring, or otherwise providing all other equitable relief the Court deems appropriate under ERISA §502(a).

## COUNT VII

### VIOLATION OF ERISA §404(A)
### BREACH OF FIDUCIARY DUTY

259.   Plaintiffs incorporate by reference all the foregoing allegations.

260.   Woellecke and Haggerty were beneficiaries and participants under the SRP

261.   As the entity appointing other plan fiduciaries, Ford itself is a

fiduciary within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), with a duty to monitor other fiduciaries and is subject to the high standards of fiduciary duties imposed on administrators of an ERISA Plan. 29 U.S.C.§1104(a)(1).

262. The remaining Defendants are fiduciaries and/or *de facto* fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), because they exert control over plan funds and/or manage or administer the plans.

263. At all relevant times, Ford wore two hats as employer/plan sponsor and as fiduciary; thus, it was a conflicted fiduciary because it not only funded the SIRP, the GRP and SRP, but also monitored the fiduciaries who administered the plans and, without an eye single to the interests of plan participants, pressured its fiduciaries to select older participants for the SIRP to interfere with their future pension benefits through bridging benefits.

264. At all relevant times, some or all of the remaining Defendants were conflicted fiduciaries who failed to administer the plan with an eye single towards the interests of the participants, including Plaintiffs and their similarly situated class members, because Defendants knew, in selecting older managers nearing Milestones, that Defendants were saving costs for Ford and for their business units and fulfilling Ford's and Ford Senior Management's objectives,

objectives under which Defendants themselves would be evaluated during performance evaluations.

265.   ERISA fiduciaries are required to provide participants complete and accurate information in response to participants questions.

266.   A fiduciary breaches its duties by materially misleading plan participants, regardless of whether the fiduciary's statements or omissions were made negligently or intentionally.

267.   Once an ERISA beneficiary or participant has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even if that requires conveying information about which the beneficiary did not specifically inquire.

268.   Defendants, as ERISA fiduciaries, had a duty to: (1) administer the plan with an eye single to the interests of participants; 2) inform a beneficiary or participant about his or her rights under an ERISA Plan; (3) give complete and accurate information in response to participants' questions; and (4) refrain from misleading communications to plan participants regarding plan administration, eligibility, and/or extent of benefits under a plan.

269.   As ERISA fiduciaries, Defendants were obligated to refrain from arbitrary and discriminatory conduct in awarding or not awarding Bridging

opportunities to its Managers who were separated as part of the 2019 SIRP.

270.   Defendants were aware of Woellecke's and Haggerty's request that they be Bridged to for age and/or service credit reasons.

271.   Defendants' communications to Plaintiffs informing them they were not eligible for bridging benefits violated ERISA because, in those communications, Defendants denied Plaintiff's claims for bridging benefits but deliberately chose not to provide Plaintiffs with a summary or copy of the SRP, and deliberately chose not to advise Plaintiffs of: the existence of the SRP; the terms of the SRP; the specific reason for denial of their claims; the specific plan provision on which denial was based; the steps to be taken to submit a claim for review, and the time limits for requesting review of denial of claim, as required under 29 U.S.C. § 1133(1), (2) and 29 CFR § 2560.503–1(f).

272.   Plaintiffs and Class Members were unlawfully denied ERISA rights by Defendants in the following respects:

> a.   Defendants deliberately concealed from Plaintiffs and Class Members the existence of the SRP when they had the legal duty to disclose the SRP to them;
>
> b.   Defendants failed to provide and concealed from Plaintiffs and Class Members the SPD or SMM as required by ERISA;
>
> c.   Defendants failed to inform and concealed from Plaintiffs and Class Members that as of January 1, 2018 each Plaintiff or Class Member could identify themselves or request identification as a "Specified Employee" pursuant to Section

2.33 of the SRP.  A Specified Employee who was identified as such by December 31, 2018 would be entitled to a Bridging benefit if separated within 12 months of the being identified as a Specified Employee;

d.  Defendants failed to inform and concealed form Plaintiffs the opportunity to be designated as eligible for Special Select Benefits pursuant to Section 1.05 of Appendix A of the SRP;

e.  Defendants failed to inform and concealed from Plaintiff and Class Members substantial changes in the SRP from its 2005 version to its January 1, 2018 version; and

f.  Defendants failed to inform and concealed from Plaintiffs and Class Members their substantial ERISA participation and appeal rights as outlined in Sections 10.01 through 10.03.

g.  Defendant Ford acted from a conflict of interest, failed to monitor the remaining Defendants in the performance of their fiduciary duties during plan administration, and actively directed the remaining Defendants to act in Ford's interest, and not in the interest of participants.

h.  The remaining Defendants acted from conflicts of interest and actively selected older Managers nearing Milestones in order to save costs for their business units and to meet their own performance objectives, and not in the interests of participants.

273.  A prudent fiduciary acting with an eye single towards the best interests of plan participants and beneficiaries would have advised Plaintiffs to pursue a formal claim for bridging under the SRP and to appeal any denial of that claim or right to participate in the SRP, especially in light of the fact that

Ford was arbitrarily awarding or not awarding bridging to Managers who were separated as part of the 2019 SIRP.

274.   In violation of its fiduciary duties as set forth above, Woellecke and Haggerty were denied an opportunity for a 3+3 Bridge and as a result of the breach of these duties they have and will continue to experience substantial economic losses.

275.   For the reasons set forth above, Plaintiffs are not required to tender back their severance payments to Ford to pursue their ERISA claims.

Accordingly, the court should order the appropriate equitable relief pursuant to Section 502(a)(3) including but not limited to a prospective injunction directing Ford to provide Plaintiffs the Bridging benefits of which Plaintiffs were unlawfully deprived.

## COUNT VIII

### FEDERAL COMMON-LAW
### ERISA EQUITABLE ESTOPPEL

276.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if set forth fully herein.

277.   Defendants made material misrepresentations to Plaintiffs, including without limitation misrepresentations about Plaintiffs' lack of Bridging rights under the GRP, SRP and the SIRP, and about Ford's inability to

adjust Plaintiffs' separation dates; and such material misrepresentations amounted to constructive fraud.

278.   Defendants remained silent about and failed to disclose to Plaintiffs and other similarly situated class members the GRP and SRP and former SIRP plan documents and the plan procedures of those plans, including claims procedures and appeal rights and procedures; and such silence amounted to silent fraud.

279.   Defendants made or ratified these material misrepresentations in bad faith to Plaintiffs and other similarly situated class members knowing that they would act upon the representations to their detriment in signing waivers and releases.

280.   Defendants made or ratified these materials representations with knowledge of the true facts of informal bridging done for other plan participants under the SIRP and with knowledge about the repeated pattern of offering Bridging rights under the GRP and SRP and with knowledge of the plans' terms prior to the most recent amended and restated plan documents

281.   Plaintiffs and other similarly situated class members reasonably relied upon these misrepresentations of material fact and silent fraud in signing their waivers and releases that were a condition of eligibility for enhanced benefits under the SIRP.

282.  Plaintiffs and similarly situated class members relied upon the representations to accept enhanced benefits under the SIRP.

283.  Defendants engaged in these misrepresentations in order to conceal their misconduct under ERISA in cutting back on the Milestone benefits and their fiduciary breaches.

284.  Under these extraordinary circumstances, these Defendants should be equitably estopped from enforcing the illegal amendment, from enforcing the SIRP involuntary separation dates against Plaintiffs and similarly situated class members, and from denying Plaintiffs and other similarly situated class members the early retirement benefits previously granted in involuntary force reductions under the GRP and the SRP.

Accordingly, Plaintiffs request that this Honorable Court enter Judgment in favor of Plaintiffs on this federal common-law equitable estoppel claim and enter an providing appropriate equitable relief pursuant to Section 502(a)(3) including but not limited to rescission of the General Release as to all Plaintiffs and class members, and a prospective injunction directing Ford to provide Plaintiffs the Bridging benefits which Plaintiffs were unlawfully deprived of.

## COUNT IX

### VIOLATION OF ADEA-DISPARATE TREATMENT

285.  Plaintiffs incorporate by reference all the allegations contained

above.

286.   At all relevant times, Ford was Plaintiff's employer within the meaning of the ADEA.

287.   As an employer under the ADEA, Ford was prohibited from limiting, segregating or classifying an employee in a way that deprives or tends to deprive the employee of an employment opportunity because of the individual's age, or to otherwise discriminate against an individual with respect to employment, compensation or a term, condition or privilege of employment because of the individual's age.

288.   In violation of the statutory duties set forth in the ADEA, Ford discriminated against Plaintiffs in the way it targeted them for termination as part of the Company's SIRP/forced ranking reduction-in-force program which caused the company to terminate employees on the basis of age.

289.   In further violation of its duty, the utilization of the SIRP/forced ranking reduction-in force program and a discriminatory algorithm resulted in older salaried employees, including Plaintiffs, receiving less favored treatment than similarly situated younger employees, resulting in their termination from employment.

290.   Prior to terminating Plaintiffs' employment under the SIRP, Ford knew or should have known that the SIRP/forced ranking program and the

75

discriminatory algorithm would result in discrimination based on age.

291. Ford's knowledge of the unlawful age bias inherent in the SIRP selection process was based on (1) disparate impact analyses and estimates completed by Ford which, if properly completed, showed or would have shown discrimination based on age; and (2) Ford's prior experiences with the same or similar forced ranking programs that have resulted in the termination of employees based on age.

292. The Company's policies as described in the First Amended Complaint constitute a pattern and practice of discrimination because the unlawful discrimination was a regular procedure or policy of the Company as evidenced by the Company's history of using forced ranking systems which have been proven to be highly discriminatory toward its older employees.

293. In the alternative, Plaintiffs and other similarly-situated employees were terminated and purportedly replaced by older employees, who were selected by Ford in order to "sprinkle" the SIRP decisional units for the purpose of making it appear that the separation process was not infected with age bias.

294. In fact, the older employees who were retained had already reached their age and/or years of service milestones under the GRP, and Ford therefore achieved its goal of discriminating against Plaintiffs and others who would become eligible for additional GRP benefits, while at the same time

76

making it appear that it did not discriminate against Plaintiffs based on age.

295.   This aspect of the Smart Redesign and SIRP termination process violated ADEA, which prohibits discrimination based on age, regardless of whether the plaintiff-employee is younger or older than the similarly situated employees who were not selected for termination.

296.   For the reasons set forth above, Plaintiffs are not required to tender back their severance benefits to Ford in order to pursue their ADEA claims.

Accordingly, Plaintiffs request the following relief from this Court:

   a.   An order of this Court declaring that the SIRP/forced ranking reduction-in-force program utilized by Ford to select individuals for layoff violates the ADEA and enjoining the further application of said policies and practices;

   b.   An order of this Court awarding Plaintiffs all economic losses, lost wages and benefits, and other forms of compensation, economic and non-economic damages, past and future, resulting from the discriminatory treatment described in this First Amended Complaint;

   c.   An order of this Court declaring that Plaintiffs are not required to tender back their severance payments to Ford and enjoining Ford from seeking the return of severance payments.

   d.   An order of this Court reinstating Plaintiffs to employment with Ford in positions comparable to those which they held at the time they were terminated;

   e.   An order of this Court awarding interest, costs and attorney fees; and

      f.     An order of this Court awarding such other relief as this Court deems just and equitable.

## COUNT X

### VIOLATION OF ADEA-DISPARATE IMPACT

297.  Plaintiffs incorporate the above allegations as if stated in full herein.

298.  The implementation of the SIRP/forced ranking reduction-in force program and the use of an algorithm, while purportedly designed to be "neutral," violates the ADEA's prohibition against age discrimination in that its application had a disparate impact on the Company's older salaried employees considered for separation.

299.  As a direct result of the disparate impact on the basis of age, Plaintiffs have suffered, and will continue to suffer, all of the injuries and damages as set forth above.

300.  For the reasons set forth above, Plaintiffs are not required to return their severance payments to Ford to pursue their ADEA claims.

Accordingly, Plaintiffs request the following relief from this Court:

      a.     An order of this Court declaring that the SIRP/forced ranking reduction-in-force program utilized by Ford to select individuals for layoff violates the ADEA and enjoining the further application of said policies and practices;

      b.     An order of this Court awarding Plaintiffs all economic losses,

lost wages and benefits, and other forms of compensation, economic and non-economic damages, past and future, resulting from the discriminatory treatment described in this First Amended Complaint;

c.     An order of this Court declaring that Plaintiffs are not required to tender back their severance payments to Ford and enjoining Ford from seeking the return of severance payments;

d.     An order of this Court reinstating Plaintiffs to employment with Ford in positions comparable to those which they held at the time they were terminated;

e.     An order of this Court awarding interest, costs and attorney fees; and

f.     An order of this Court awarding such other relief as this Court deems just and equitable.

## COUNT XI

## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT DISPARATE TREATMENT – AGE DISCRIMINATION

301.  Plaintiffs incorporate by reference all the allegations contained above.

302.   At all relevant times, Ford was Plaintiff's employer within the meaning of the ELCRA, MCL §37.2201(a).

303.   As an employer under the ELCRA, Ford is prohibited from limiting, segregating or classifying an employee in a way that deprives or tends to deprive the employee of an employment opportunity because of the

individual's age, or to otherwise discriminate against an individual with respect to employment, compensation or a term, condition or privilege of employment because of the individual's age.

304.  In violation of the statutory duties set forth in the ELCRA, Ford discriminated against Plaintiffs in the way it targeted them for termination as part of the Company's SIRP/forced ranking reduction-in-force program which caused the company to terminate employees on the basis of age.

305.  In further violation of its duty, the utilization of the SIRP/forced ranking reduction-in force program and a discriminatory algorithm resulted in older salaried employees, including Plaintiffs, receiving less favored treatment than similarly-situated younger employees, resulting in their termination from employment.

306.  Prior to terminating Plaintiffs' employment under the SIRP, Ford knew or should have known that the SIRP/forced ranking program and the discriminatory algorithm would result in the termination of employees based on age, based on (1) disparate impact analyses and estimates completed by Ford which, if properly completed, showed or would have shown discrimination based on age; and (2) Ford's prior experiences with the same or similar forced ranking programs that have resulted in the termination of employees based on age.

307.   The Company's policies as described in the Complaint constitute a pattern and practice of discrimination because the unlawful discrimination was a regular procedure or policy of the Company as evidenced by the Company's history of using forced ranking systems which have been proven to be highly discriminatory toward its older employees.

308.   Plaintiffs bring their ELCRA claims pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), individually, and on behalf of all salaried, grade level LL1 through LL5 employees, above 50 years of age and/or 25 years of service, that were selected for separation under the Fourth Wave of the 2019 SIRP, using the forced ranking, future contribution assessment, BCG algorithm, and other common selection criteria utilized by Ford to select employees for separation in the Fourth Wave of the 2019 SIRP.  Plaintiffs reserve the right to amend this definition as necessary.

309.   Defendant's employment practices, specifically the SIRP selection criteria described herein, were applied in the same or similar fashion to all members of the Plaintiff Class.

310.   Plaintiffs seek to maintain this Class, pursuing their claims under ELCRA pursuant to Fed. R. Civ. P. 23, on the issues of whether Defendant engaged in unlawful age discrimination against Plaintiff and similarly situated class members.

311.  The Class is so numerous that joinder of all members is impracticable, as hundreds if not thousands of employees have been subjected to the employment practices described herein.

312.  Plaintiffs do not know the precise number of the Class but can ascertain this information from Defendant's records.

313.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.

314.  Questions of law and fact common to the Class include whether Defendant violated ELCRA by implementing the Fourth Wave of the 2019 SIRP utilizing forced ranking, future contribution assessment, calibration, BCG algorithm, and other commonly applicable selection criteria managers, ages 50 and older.

315.  Plaintiffs' claims are typical of the claims of the Class members.

316.  Plaintiffs are adequate representatives of the Class for the reasons set forth above.

317.  Plaintiffs are members of the class and, given their injuries and losses, are committed to the prosecution of this action for the benefit of the Class.

318.  Plaintiffs have retained counsel who are competent and

experienced in employment litigation and age discrimination claims, including class action litigation, and who intend to prosecute this action vigorously.

319.   Plaintiffs have no interests that would cause them to act adversely to the best interests of the class.

320.   The maintenance of this action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice.

321.   The prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class.

322.   Defendant has acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating declaratory and injunctive relief for the Class.

323.   Accordingly, Plaintiffs request the following relief from this Court for themselves on behalf of the Plaintiff class:

      a.    An order of this Court declaring that the SIRP/forced ranking reduction-in-force program utilized by FMC to select individuals for layoff violates the ELCRA and enjoining the further application of said policies and practices;

      b.    An order of this Court awarding Plaintiffs all economic losses, lost wages and benefits, and other forms of compensation, economic and non-economic damages, past and future, resulting from the discriminatory treatment described in this

Complaint;

c.    An order of this Court reinstating Plaintiffs to employment
with Ford in positions comparable to those which they held
at the time they were terminated;

d.    An order of this Court awarding interest, costs and attorney
fees; and

e.    An order of this Court awarding such other relief as this
Court deems just and equitable.

## COUNT XII

## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT
## DISPARATE IMPACT – AGE DISCRIMINATION

324.  Plaintiffs incorporate by reference all the allegations contained
above, including the class action allegations set forth under Count II.

325.  The implementation of the SIRP/forced ranking reduction-in force
program and the use of an algorithm while purportedly designed to be
"neutral," violates the ELCRA's prohibition against age discrimination in that its
application had a disparate impact on the Company's older salaried employees
considered for separation, including Plaintiffs and the similarly situated class
members they seek to represent.

326.  As a direct result of the disparate impact on the basis of age,
Plaintiffs have suffered, and will continue to suffer, all of the injuries and

damages as set forth above.

327.  Accordingly, Plaintiffs request the following relief from this Court

for themselves and on behalf of the Plaintiff Class.

    a.  An order of this Court declaring that the SIRP/forced ranking reduction-in-force program utilized by FMC to select individuals for layoff violates the ELCRA and enjoining the further application of said policies and practices;

    b.  An order of this Court awarding Plaintiffs all economic losses, lost wages and benefits, and other forms of compensation, economic and non-economic damages, past and future, resulting from the discriminatory treatment described in this Complaint;

    c.  An order of this Court reinstating Plaintiffs to employment with Ford in positions comparable to those which they held at the time they were terminated;

    d.  An order of this Court awarding interest, costs and attorney fees; and

    e.  An order of this Court awarding such other relief as this Court deems just and equitable.

### COUNT XIII

**CLAIM FOR BENEFITS DUE**
**ERISA §502(a)(1)(B)**
**PLAINTIFFS vs. DEFENDANTS**
**COMMITTEE OF THE SRP and**
**SRP and GRP PLAN ADMINISTRATORS**

328.  Plaintiffs incorporate all the foregoing paragraphs by reference, as

if stated in full herein.

329.   ERISA § 502(a)(1)(B) provides a cause of action for the recovery of wrongfully denied benefits under an ERISA plan.

330.   ERISA § 502(a)(1)(B) provides: "A civil action may be brought—(1) by a participant or beneficiary—... (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

331. Defendants SRP Committee and the SRP and GRP Plan Administrators wrongfully denied Plaintiffs bridging benefits under its ERISA plans, as alleged in this complaint.

332.  The SRP and other Ford ERISA Plan language provided that Plaintiffs, as LL1-LL5 employees, were eligible for bridging benefits.

333.  Defendants' practice prior to Plaintiffs' termination from employment was to provide employees such as Plaintiffs with bridging benefits under the SRP and other Ford ERISA Plan language.

334.   Defendants acted contrary to the terms of those Plans when they refused to provide bridging benefits to Plaintiffs and members of the class who were eligible for bridging benefits.

335.   Furthermore, the GRP provides for an early retirement supplement "30 and out" for employees who reach 30 years of credited service, regardless of age.

336.   The SRP provides that an employee is only eligible for GRP Select Benefits (bridging benefits) if their attained service time, after adding three years, allows them to meet the eligibility requirement, *and* if the employee "is at least age 55, taking into consideration the three additional years of age provided under this Plan, as of the Retirement Effective Date[.] (SRP as of 1/1/18, Sec. 2.21, defining "Eligible Executive(s)").  This language effectively amends the GRP by grafting on the age 55 requirement for obtaining 30 and out benefits, i.e., providing that in order to receive "30 and out" benefits, the employee must reach 30 years *and* be at least 55 years old.  This amendment reduces the accrual of 30 and out benefits for Plaintiffs and is a prohibited cutback under §204(h) and is therefore void.

337.   Ford should have provided Plaintiffs with bridging and 30 and out benefits under the terms of the GRP, without giving effect to the imposition of the age 55 minimum and cutback of benefits alleged above.

338. In the alternative, Ford should have provided Plaintiff with bridging, 55 and 10, and/or 30 and out benefits pursuant to the SRP and GRP because there was no objective criteria upon which to deny Plaintiffs' claims for bridging benefits, and any decision to the contrary was arbitrary and capricious.

339. Prior to their termination dates, and before filing this action, Plaintiffs contacted Ford management to request bridging benefits.

340. Ford sent Plaintiffs emails stating there was nothing they could do to obtain bridging benefits.

341. Ford did not inform Plaintiffs of any right to submit a claim or appeal.

342. Ford offered Plaintiffs no relief or other opportunity for review.

343. Thus, any further steps by Plaintiffs to exhaust their claims would have been futile, and further exhaustion of administrative remedies should be excused.

344. Ford's communications to Plaintiffs failed to provide: reference to the specific plan provisions on which the determination was based; a description of any additional material or information necessary for the participant or beneficiary to perfect a claim for benefits and an explanation of why such material or information was necessary; or a description of the Plan's

review procedures and the time limits applicable to such procedures, including

a statement of the claimant's right to bring a civil action under 29 U.S.C. §

502(a), as required by ERISA § 503, 29 U.S.C. § 1133, and as required by ERISA

§503 or the DOL Regulations governing claims procedures, promulgated at 29

C.F.R. 2550.503-1.

345.   Plaintiffs and members of the class are entitled to recover the

benefits due to them in the form of their bridging benefits and GRP early

retirement benefits.

## REQUEST FOR RELIEF

Accordingly, Plaintiffs request for themselves and the Class they purport

to represent the following relief:

a.   All the relief requested in the various counts asserted in this
     Second Amended Complaint;

b.   A declaratory judgment that the general release is unenforceable,
     unconscionable, and void or voidable;

c.   A declaratory judgment that the lawsuit may proceed as a
     putative class action;

d.   An order of prospective injunctive relief directing that each
     Plaintiff and Class Member should receive a 3+3 Bridge and
     adjusting the lump sum value of their pension accordingly;

e.      An order setting aside the release of claims and an injunctive

order enjoining Ford from enforcing the releases that Plaintiffs

and Class members executed because it was not a knowing and

voluntary waiver and product of fraudulent concealment;

f.      An order awarding Plaintiffs and Class members damages caused

by the breach of ERISA fiduciary duties and the ensuing wrongful

termination;

g.      An order awarding Woellecke, Haggerty and Class Members

attorney fees and costs of litigation;

h.      An order awarding Plaintiffs and Class Members such other relief

as the court deems appropriate.

Respectfully submitted,

Pitt, McGehee, Palmer and Rivers PC

By: */s/ Michael L. Pitt*
Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Kevin M. Carlson (P67704)
Attorneys for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
mpitt@pittlawpc.com
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com

Date:  January 30, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WERNER WOELLECKE, TERRY HAGGERTY
individually and on behalf of
similarly situated LL1 through LL5
former Ford Motor Company managers

**CLASS ACTION**

      Plaintiffs,                       Case No.19-cv-12430

vs.                                    Hon. Bernard A. Friedman

FORD MOTOR COMPANY,
a Delaware Corporation,

      Defendant.

---

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury as to all issues raised in this action.

                         Respectfully submitted,

                         Pitt, McGehee, Palmer and Rivers PC

                         By: */s/ Michael L. Pitt*
                         Michael L. Pitt (P24429)
                         Megan A. Bonanni (P52079)
                         Kevin M. Carlson (P67704)
                         Attorneys for Plaintiffs
                         117 West Fourth Street, Suite 200
                         Royal Oak, Michigan 48067
                         (248) 398-9800 (phone)
                         (248) 268-7996 (fax)
                         mpitt@pittlawpc.com
                         mbonanni@pittlawpc.com
                         kcarlson@pittlawpc.com

Date:  January 30, 2020

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing instrument was filed with the U.S. District Court through the ECF filing system and that all parties to the above cause was served via the ECF filing system on January 30, 2020.

Signature: _____/s/ Carrie Bechill_____
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
cbechill@pittlawpc.com